# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

---

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| DELTA-T CORPORATION, | ) | |
| | ) | Case No. 10-50980-SCS |
| *Debtor.* | ) | |
| | ) | |
| CLARA P. SWANSON, | ) | |
| CHAPTER 7 TRUSTEE, | ) | |
| | ) | APN 10-05043-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| APPLIED PROCESS TECHNOLOGY | ) | |
| INTERNATIONAL, LLC, | ) | |
| BATEMAN LITWIN, N.V., | ) | |
| BATEMAN ENGINEERING, INC., | ) | |
| DCR CONSTRUCTION, INC., | ) | |
| M&I MARSHALL & ILSLEY BANK, | ) | |
| PACE ANALYTICAL SERVICES, INC., | ) | |
| | ) | Chapter 7 |
| *Defendants.* | ) | |

---

## MEMORANDUM OPINION

This matter comes before the Court upon the Complaint filed by Clara P. Swanson, Chapter 7 Trustee ("Trustee"), against the defendants DCR Construction, Inc. ("DCR") and M&I Marshall & Ilsley Bank ("M&I"). Following the conduction of oral argument on February 13, 2012, the Court took this matter under advisement. The Trustee, DCR, and M&I have stipulated to the facts necessary for this Court to decide the merits of the Complaint, and the matter is therefore ripe for

decision.  The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(2)[1] and

1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).  This Memorandum Opinion

constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52, as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7052.

## I. History

### A. The Background of the Bankruptcy Case

The debtor, Delta-T Corporation ("Delta-T"), was founded in 1984.  At one time, Delta-T

was viewed as one of the leading bioethanol technology providers in the nation, offering design and

manufacturing services and products.  Complaint ¶ 10.  Delta-T began experiencing financial

difficulties, and on May 25, 2010 (the "Petition Date"), Delta-T filed a petition for relief under

Chapter 7 of Title 11 of the United States Code in this Court.  Stipulation ¶ 1.  The Trustee was duly

appointed as the Chapter 7 Trustee for Delta-T.  *Id*. ¶ 2.  On November 18, 2010, the Trustee

commenced the above-captioned adversary proceeding by filing a fourteen-count Complaint against:

(i) Applied Process Technology International, LLC ("APTI"); (ii) Bateman Litwin, N.V. ("Bateman

Litwin"); (iii) Bateman Engineering, Inc. ("Bateman Engineering"); (iv) DCR; (v) M&I; and (vi)

Pace Analytical Services, Inc. ("Pace").[2]

---

[1] The Court concludes that it is vested with the authority to enter a final judgment in this
matter pursuant to 28 U.S.C. §§ 157(b)(1) and that the holding in *Stern v. Marshall*, 131 S. Ct.
2594 (2011), does not apply to the instant matter.

[2] Pace neither timely filed an Answer to the Complaint nor has Pace filed any other
pleadings or made any appearance in this matter.  Counsel for the Trustee confirmed during oral
argument that resolution of the matters herein are necessary prior to a determination of the
allegations made against Pace in the Complaint.  *See* Complaint ¶ 164(d) n.2 (noting that,
although Pace has asserted it has a lien against all of Delta-T's accounts receivable pursuant to a
financing statement filed March 8, 2010, (1) the Trustee is not aware that Delta-T owned such
property on that date, and, thus, the Trustee does not believe that any lien possessed by Pace ever

## B.  The Settlement Agreement

In August 2011, the Trustee entered into a settlement agreement with APTI, Bateman Litwin, and Bateman Engineering, which, following a hearing, was approved by this Court by order entered on November 3, 2011 ("Settlement Agreement").  Pursuant to the Settlement Agreement, among other things, Bateman Litwin and APTI assigned to the Trustee the totality of their interests in certain garnished funds described in the Complaint, held pursuant to a writ of garnishment issued by the United States District Court for the Middle District of Florida, in the approximate amount of $648,000.00 ("Garnished Funds").[3]  Accordingly, the only remaining contest between the Trustee on the one hand and DCR and M&I on the other hand is that contained in Count Twelve of the Complaint, which seeks entry of a declaratory judgment regarding the extent, validity, and priority of the liens allegedly held by DCR and M&I with respect to the Garnished Funds.[4]

## II.  The Complaint Against DCR and M&I

With respect to defendants DCR and M&I,[5] the Trustee alleges as follows:

---

attached, and (2) in the event a lien did attach, such lien would be avoidable as a preferential transfer since it was recorded within the ninety (90) day period preceding the Petition Date).

[3] Counsel for the Trustee as well as counsel for DCR and M&I confirmed on the record during oral argument that the Trustee now holds whatever interests Bateman Litwin and APTI had in the Garnished Funds.

[4] DCR previously filed a crossclaim against APTI (*see* Adversary Proceeding Docket Entry 23, filed January 31, 2011), which the parties agree has now been rendered moot by the Settlement Agreement.  Stipulation ¶ 3.

[5] The interest of M&I in the Garnished Funds is entirely derivative of the rights of DCR in the Garnished Funds, and M&I has no independent basis other than through DCR for asserting a claim against the Garnished Funds.  *See* Complaint ¶ 42 (noting that M&I was added as a co-plaintiff to the judgment received by DCR in the Florida District Court, which judgment gave rise to the alleged lien held by both DCR and M&I).  Counsel for DCR confirmed at oral argument that M&I's interest in the Garnished Funds is congruent to that held by DCR. Accordingly, as the positions of DCR and M&I are congruous, any reference to any claim of

3

41. . . . DCR obtained a judgment in the amount of $6,178,928.24 plus interest dated December 31, 2009 against Delta-T, in the United States District Court for the Middle District of Tampa [*sic*] (hereafter the "[Florida] District Court").

42. The [Florida] District Court entered an order directing the clerk to enter an amended judgment dated January 5, 2010 adding the co-plaintiff, M&I Marshall Ilsley Bank as a judgment creditor. The Clerk entered an amended judgment showing both co-plaintiffs on that same day.

43. On January 15, 2010, the Florida District Court entered an Order Authorizing Writs of Garnishment against Bank of America and Branch Bank[ing] and Trust Company ("BB&T") to enforce the DCR judgment.

44. According to the pleadings on file in the Florida District Court proceedings, BB&T is holding approximately $648,662.58 (the "Garnished Funds") pursuant to the writ.

45. The Garnished Funds were generated by the sale of certain items of personal property that Delta-T owned. Between December 12, 2009 and January 15, 2010, Delta-T sold its excess steel to two scrap dealers. These sales were made pursuant to purchase orders and evidenced by invoices, signed and issued prior to payment being made to Delta-T. For each sale, Delta-T and the respective buyer entered into a binding contract for the purchase of the goods, and title to those goods transferred, prior to the buyer making payment.

46. The Garnished Funds consist entirely of the proceeds of "accounts" as that term is defined in the Uniform Commercial Code, including the proceeds of accounts arising from the sale of the Debtor's excess steel.

. . . .

163. There is currently a dispute between the Trustee and [DCR and M&I] regarding the extent, validity and priority of property of their liens against, or rights in and to the estate, including the Garnished Funds.

164. Based upon the records reviewed by the Trustee to date, the following parties assert liens against property of the estate:

    a. APTI by virtue of its alleged liens dating back to the June 1 Note,

---

DCR to the Garnished Funds will include the claim of M&I without further specific reference.

4

which was perfected on August 5, 2009;[6]

b. DCR by virtue of its garnishment order and its writs of execution, which were perfected no earlier than January 15, 2010;

c. M&I Bank, as a co-plaintiff with regard to the DCR liens, which was perfected no earlier than January 15, 2010; and

d. Pace, which filed a financing statement against all of the Debtor[']s accounts receivable on March 8, 2010.[7]

165. As noted above, the lien securing the June 1 Note is (i) the first lien filed against Delta-T's tangible and intangible personal property (exclusive of inventory); and (ii) avoidable for the benefit of the bankruptcy estate pursuant to 11 U.S.C. § 551. Although the Debtor and Bateman Litwin entered into the Amended Note on or about December 1, 2009, that instrument specifically stated that it did not satisfy or otherwise discharge the underlying instruments it sought to consolidate. Accordingly, the lien securing the June 1 Note was likewise not discharged or released.

166. Because the lien securing the June 1 Note is avoidable as a preference, given that it was not perfected until roughly 60 days after the Note was executed, it is avoidable for the benefit of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 551.

167. The amount of the June 1 Note is $7,272,186, a sum which vastly exceeds the value of all existing property of the estate, including the Garnished Funds.

168. The Trustee's rights, in and to all property of the estate are thus superior to all

---

[6] By reason of the Settlement Agreement described above, the Trustee is now the beneficiary of all security interests previously held by APTI in any property of Delta-T.

[7] The footnote to subparagraph (d) of Paragraph 164 of the Complaint states as follows:

As of the date of this Complaint, the Trustee is not aware of any accounts owned by [Delta-T] as of March 8, 2010. Thus, it does not appear that Pace's lien ever attached. The Trustee nevertheless included Pace within this Complaint out of an abundance of caution. Regardless of whether there was property to which the lien could attach, it is clearly preferential since it was recorded within 90 days of the Petition Date and the other elements of 11 U.S.C. § 547(b) are met.

Complaint ¶ 164(d) n.2.

other alleged lien creditors or other claimants.

169. Even if the liens securing the June 1 Note and the other Notes are deemed to have been discharged by virtue of the Amended Note, however, that instrument too is void or avoidable by the Trustee for the benefit of the Debtor's bankruptcy estate. Accordingly, the Trustee's rights in and to all property of the estate are still superior to all other alleged lien creditors or other claimants.

Complaint ¶¶ 41-46, 163-69. In its answer ("DCR Answer"), DCR asserts the Garnished Funds "are the proceeds of the cash sales of inventory, which had been located in DCR's yard located in Florida, to two different buyers and for which payment was made substantially contemporaneously with receipt of the inventory by the buyers." DCR Answer ¶ 45. DCR further asserts that the Garnished Funds consist primarily of the proceeds of inventory, with the source of the remaining funds being unknown. *Id*. ¶ 46. DCR also pleaded in the affirmative that any security interest granted to Bateman Litwin would have been avoidable by DCR under Florida state law pursuant to Fla. Stat. § 726.106(2), and, thus, even if the Trustee avoids and retains the alleged Bateman Litwin security interest, that security interest remains avoidable by DCR. *Id*. ¶ 186.[8]

APTI answered and cross-claimed against DCR, claiming a superior entitlement to the Garnished Funds on three bases:

19. The Garnished Funds are the proceeds from Delta-T's exercise of its right of replevin of DCR as to the raw materials pursuant to the Final Judgment rendered in the Replevin suit.

20. Alternatively, the Garnished Funds are the proceeds of accounts (or payment intangibles) generated by the purchase orders Delta-T received from the scrap dealers immediately prior to delivery of the raw materials to the scrap handlers.

---

[8] The answer filed on behalf of M&I denies the factual allegations contained in paragraphs 45 and 46 the Complaint, as well as those allegations contained in paragraphs 163 through 169. The M&I Answer also sets forth an affirmative defense identical to the one contained in the DCR Answer.

21. Alternatively, if the raw materials were the inventory of Delta-T, APTI had a perfected security interest therein without the requirement of a financing statement being filed. The lien on the inventory attached and was liquidated prior to the expiration of the filing deadline under applicable state law.

APTI Cross-Claim ¶¶ 19-21. APTI has now exited this adversary proceeding by reason of the Settlement Agreement with the Trustee. Counsel for the Trustee advised at oral argument that the Trustee now relies only on the argument that the purchase orders for the sale of the excess steel created accounts in which the Trustee has a security interest as a result of the Settlement Agreement, and that the Trustee's security interest attached to the proceeds of those accounts, thereby giving the Trustee rights superior to any rights DCR and M&I may have in the Garnished Funds. Counsel for the Trustee confirmed that the Trustee has abandoned any and all additional arguments that were raised in the pleadings filed in this matter by APTI, Bateman Litwin, and/or Bateman Engineering and now held by her by virtue of the Settlement Agreement she entered into with those parties. Counsel for DCR affirmed that DCR likewise abandons all other arguments regarding entitlement to the Garnished Funds. DCR now relies only on its argument that it holds a superior lien on the Garnished Funds because the funds represent the proceeds of inventory, not accounts.

Given the nature of the resolution of the Complaint between the Trustee, APTI, Bateman Litwin, and Bateman Engineering, the remaining issue for this Court is to decide is the superiority of entitlement to the Garnished Funds between the Trustee, as the beneficiary of the security interests previously held by APTI and Bateman Litwin against Delta-T, and DCR and M&I as lien creditors as to the Garnished Funds.[9]

---

[9] M&I intervened in the garnishment proceeding initiated by DCR against Delta-T in the Florida District Court. *See* DCR Exhibit 2, Motion to Amend Judgment dated December 31, 2009, admitted at October 20, 2010 hearing on the Motion for Relief from Stay filed by DCR (which exhibit was stipulated to as an exhibit for the instant proceeding, as discussed in Section

III.  Findings of Fact

A.  The Stipulation

The Trustee and DCR entered into an extensive factual stipulation to provide the basis for

the factual findings necessary to resolve the remaining count of the Complaint as to DCR and M&I

("Stipulation").  The Stipulation provides, in pertinent part, as follows:

4. Prior to the Petition Date, the Debtor executed a series of Promissory Notes
(collectively, the "Promissory Notes") in favor of Bateman Litwin, N.V., its ultimate
parent corporation. These Promissory Notes are more particularly described as
follows:

a. A Secured Loan Agreement and Promissory Note dated June 1,
2009 (the "June 1 Note"), in the original principal amount of
$7,272,186. A true and correct copy of the June 1 Note is attached
hereto as Exhibit 1. The lien securing repayment of the June 1 Note
was perfected on August 5, 2009, by the filing of a financing
statement with the Virginia State Corporation Commission. A true
and correct copy of this filing statement as filed with the Virginia
State Corporation Commission is attached hereto as Exhibit 2.

b. A Secured Loan Agreement and Promissory Note dated July 1,
2009 (the "July 1 Note"), in the original principal amount of
$3,025,000. A true and correct copy of the July 1 Note is attached
hereto as Exhibit 3. The lien securing repayment of the July 1 Note
was perfected on August 5, 2009, by the filing of a financing
statement with the Virginia State Corporation Commission. A true
and correct copy of this financing statement as filed with the Virginia
State Corporation Commission is attached hereto as Exhibit 4.

c. A Secured Loan Agreement and Promissory Note dated August 7,
2009 (the "August 7 Note"), in the original principal amount of

---

III.A, *infra*).  M&I financed the operations of DCR and apparently claims a security interest in
certain assets of DCR, including any claim by DCR to the Garnished Funds.  *Id*.  As confirmed
by counsel for DCR, the rights and interests of M&I in the Garnished Funds, and, thus, in this
proceeding, are derivative of this claimed security interest.  Accordingly, M&I's claim to the
Garnished Funds sounds only through any claim of DCR to the Garnished Funds.  The interests
of M&I have been represented in these proceedings by and through the same counsel
representing DCR.

$3,996,232.51. A true and correct copy of the August 1 Note is attached hereto as Exhibit 5. The lien securing repayment of the August 7 Note was perfected on September 18, 2009, by the filing of a financing statement with the Virginia State Corporation Commission. A true and correct copy of this financing statement as filed with the Virginia State Corporation Commission is attached hereto as Exhibit 6.

d. A Secured Loan Agreement and Promissory Note dated September 1, 2009 (the "September 1 Note"), in the original principal amount of $449,810.41. A true and correct copy of the September 1 Note is attached hereto as Exhibit 7. The lien securing repayment of the September 1 Note was perfected on September 14, 2009, by the filing of a financing statement with the Virginia State Corporation Commission. A true and correct copy of this financing statement as filed with the Virginia State Corporation Commission is attached hereto as Exhibit 8.

e. A Secured Loan Agreement and Promissory Note dated September 10, 2009 (the "September 10 Note"), in the original principal amount of $5,000,000. A true and correct copy of the September 10 Note is attached hereto as Exhibit 9. The lien securing repayment of the September 10 Note was perfected on September 18, 2009, by the filing of a financing statement with the Virginia State Corporation Commission. A true and correct copy of this financing statement as filed with the Virginia State Corporation Commission is attached hereto as Exhibit 10.

f. A Secured Loan Agreement and Promissory Note dated September 11, 2009 (the "September 11 Note"), in the original principal amount of $300,000. A true and correct copy of the September 11 Note is attached hereto as Exhibit 11. The lien securing repayment of the September 11 Note was perfected on October 8, 2009, by the filing of a financing statement with the Virginia State Corporation Commission. A true and correct copy of this financing statement as filed with the Virginia State Corporation Commission is attached hereto as Exhibit 12.

g. A Secured Loan Agreement and Promissory Note dated October 1, 2009 (the "October 1 Note"), in the original principal amount of $1,492,666.20. A true and correct copy of the October 1 Note is attached hereto as Exhibit 13. The lien securing repayment of the October 1 Note was perfected on October 8, 2009, by the filing of a financing statement with the Virginia State Corporation Commission.

9

A true and correct copy of this financing statement as filed with the Virginia State Corporation Commission is attached hereto as Exhibit 14.

h. A Secured Loan Agreement and Promissory Note dated November 3, 2009 (the "November 3 Note"), in the original principal amount of $495,000. A true and correct copy of the November 3 Note is attached hereto as Exhibit 15. The lien securing repayment of the November 3 Note was perfected on November 12, 2009, by the filing of a financing statement with the Virginia State Corporation Commission. A true and correct copy of this financing statement as filed with the Virginia State Corporation Commission is attached hereto as Exhibit 16.

i. An Amended and Restated Promissory Note dated December 1, 2009, (the "Amended and Restated Note") in the amount of $22,280,892.12, which, by its terms, consolidated the previous notes, altered the interest rate and adjusted the payment schedule under the prior notes. A true and correct copy of the Amended and Restated Note is attached hereto as Exhibit 17. The Amended Note was perfected on December 4, 2009, by the filing of a financing statement with the Virginia State Corporation Commission. A true and correct copy of this financing statement as filed with the Virginia State Corporation Commission is attached hereto as Exhibit 18.[10]

5. On or about January 13, 2010, Bateman Litwin assigned the Promissory Notes to APTI. On or about January 29, 2010, APTI conducted a foreclosure sale of certain of the collateral security [*sic*] repayment of the amounts due under the Promissory Notes. APTI was the sole bidder at the sale, tendering a bid of $2.2 million.

6. As of the date of this Stipulation, and after application of all available credits, the balance due under the Promissory Notes exceeds the amount of the Garnished Funds, even after taking into account all other property which allegedly secures repayment of the Promissory Notes.[11]

7. On February 18, 2009, DCR obtained an arbitration award against Delta-T in the

---

[10] Collectively, the secured loan agreements referenced in Paragraph 4 of the Stipulation will be referred to herein as "Security Agreements."

[11] According to DCR, Delta-T has not made any payments toward satisfaction of the Judgment.  DCR Trial Memorandum at 6.  The Trustee does not contest this assertion anywhere in her pleadings.

amount of $5,322,003.20. This award was increased on April 16, 2009, to $6,178,928.24 on April 16, 2009 [*sic*]. On April 20, 2009, DCR filed a petition with the Florida District Court seeking to confirm the arbitration award. On January 5, 2011,[12] the Florida District Court entered an Order directing the Clerk to enter judgment (the "Judgment") against Delta-T, and in favor of DCR and M&I in the amount of $6,178,928.141. On January 15, 2010, the Florida District Court entered an Order Authorizing Ex Parte Writs of Garnishment against Bank of America ("BOA") and Branch Banking & Trust Company ("BB&T"). The BB&T and BOA writs were issued and served the dame [*sic*] day. BB&T answered the writ and admitted it holds $648,662.59 (the "Garnished Funds"). BOA answered the writ and admitted it holds $4,470.20. BB&T now holds the Garnished Funds pursuant to the Florida District Court writ.

8. Prior to the Petition Date, the Debtor was the owner of, among other things, certain stainless steel tubing (the "Stainless Steel") which was located at DCR's yard in Lakeland, Florida.

9. In late November, 2009 or early December, 2009, the Debtor began discussions with Central City Steel ("CCS") in order to sell a portion of the Stainless Steel. On December 2, 2009, CCS issued to the Debtor a Purchase Order for a portion of the Stainless Steel. The Purchase Order was subsequently corrected to remove certain items which were not to be sold to CCS (as corrected, the "CCS Purchase Order"). By December 4, 2009, the Debtor had accepted the Purchase Order, as revised, and issued an email to DCR advising that CCS was authorized to pick-up those portions of the Stainless Steel which had been sold to CCS. A true and correct copy of the CCS Purchase Order is attached to the Stipulation as Exhibit 19.

10. CCS picked up those portions of the Stainless Steel which it had purchased on December 15-16, 2009 and January 14, 2009.[13] CCS paid for the Stainless Steel by wire transfers initiated on December 17, 2009 in the aggregate amount of $126,000.00, and on January 15, 2010 in the aggregate amount of $101,500.00.

11. At or around the same time that it entered into negotiations with CCS, the Debtor began negotiating with Pasco Iron & Metal ("Pasco") for a purchase of the remaining Stainless Steel. On January 5, 2010, Pasco issued to the Debtor a Purchase Order (the "Pasco Purchase Order") for that portion of the Stainless Steel that it was acquiring.

---

[12] Based upon the Court's review of the exhibits and other pleadings in this matter, it appears that a scrivener's error appears here, and the actual date on which the Florida District Court entered judgment against Delta-T was January 5, 2010.

[13] Based upon the Court's review of exhibits and other pleadings in this matter, it appears that a scrivener's error appears here, and the correct date is January 14, 2010.

A true and correct copy of the Pasco Purchase Order is attached to the Stipulation as Exhibit 20. The Purchase Order was accepted by the Debtor on that same day.

12. Pasco picked up those portions of the Stainless Steel which it had purchased on (i) January 7, 2010; (ii) January 11, 2010; and (iii) January 12, 2010. Pasco paid for the Stainless Steel by wire transfers initiated on (i) January 7, 2010; (ii) January 12, 2010; and (iii) January 13, 2010, in the aggregate amount of $448,728.00.

13. All told, Delta-T received $676,228.00 as a result of the sales of the Steel to CCS and Pasco. These funds were deposited into the Debtor's general operating account at BB&T. Of the Garnished Funds, $47,610.48 is not attributable to the sales of the Steel to Pasco and CCS.

Stipulation ¶¶ 4-13.

The Trustee and DCR also stipulated to the admissibility of certain documents (collectively, the "Stipulated Exhibits") and testimony:

a. The December, 2009 bank statement for the BB&T Account, attached to the Stipulation as Exhibit 21.

b. The January, 2010 bank statement for the BB&T Account, attached to the Stipulation as Exhibit 22.

c. The Amended Judgment in favor of the Judgment Creditors [DCR and M&I], and against Delta-T, attached to the Stipulation as Exhibit 23.

d. The transcript of the September 8, 2011 deposition of David Emmanuel Hughes, attached to the Stipulation as Exhibit 24.

e. The transcript of the August 9, 2011 deposition of Matthew Goldman, attached to the Stipulation as Exhibit 25.

f. The transcript of hearing held on October 20, 2010, attached to the Stipulation as Exhibit 26 ["October 20 Transcript"].

g. The Exhibits 1 through 15 tendered by DCR in relation to its previously filed Motion for Relief from Stay (Docket #96 – List of Witnesses and Exhibits).

h. The Exhibits A through S tendered by the Trustee in relation to DCR's Motion for Relief from Stay (Docket #102 – List of Exhibits).

*Id*. ¶ 14.  A review of the Stipulated Exhibits confirms that, while the Trustee (through assignment

of the security interests of APTI and Bateman Litwin) holds the security interest in the accounts of

Delta-T and all proceeds thereof, at no time relevant here has the Trustee possessed a valid security

interest in the inventory of Delta-T.[14]

### B.  The Depositions

As noted in the Stipulation, the Trustee and DCR stipulated to the submission into evidence

of various depositions taken in this proceeding.  A summary of the portions relevant to the remaining

dispute between the Trustee, DCR, and M&I follows.

### 1.  The Deposition of David Hughes

The deposition upon oral examination of David Hughes ("Hughes"), taken on September 8,

2011, was agreed to by the parties and submitted as Stipulated Exhibit 24 ("Hughes Deposition").

Hughes previously served as Vice President of Projects for Delta-T and at the time of the deposition

served as President and General Manager of APTI.  Hughes Deposition at 7.  Hughes testified that,

while employed by Delta-T, he contacted Central City Steel ("Central City") to negotiate a sale of

a portion of Stainless Steel owned by Delta-T and located in the DCR storage yard in Lakeland,

Florida.  *Id*. at 14-15.  Hughes identified an e-mail he sent on December 4, 2009, to a Chuck

Langford, in response to an e-mail from Langford, in which Hughes identified the specific items of

Stainless Steel purchased by Central City.  *Id.* at 15-17 (citing Deposition Exh. 12).  Hughes also

identified a purchase order from Central City (*see* Deposition Exh. 13) and testified that "[w]e

negotiated the price, and then the purchase order was created."  Hughes Deposition at 18.  The

purchase order was accepted by Delta-T, according to Hughes, at the end of November 2009 or early

December 2009.  *Id*.; *see also id*. at 29.  Hughes also identified documents relevant to Delta-T's sale

---

[14] *See* Stipulated Exhibits 1 through 18.

13

of a portion of the Stainless Steel to Pasco Iron and Metal.[15] *See id.* at 26-27.

### 2. The Deposition of Matthew Goldman

The deposition upon oral examination of Matthew Goldman ("Goldman"), submitted as Stipulated Exhibit 25, was taken on August 9, 2011 ("Goldman Deposition"). Goldman is the president of Pasco Iron and Metal ("Pasco"), and he personally arranged the purchase of a portion of the Stainless Steel from Delta-T. Goldman Deposition at 4. The terms of the purchase were described by Goodman as "[n]et cash, cash against documents. As soon as the material's received at our facility, we will send a wire out immediately for the following day." *Id.* at 6. Goodman testified the purchase order between Pasco and Delta-T constituted the entire agreement for the purchase of a portion of the Stainless Steel. *Id.* at 8, 25.

Goodman described Pasco's payment obligation for the Stainless Steel as "[t]he same as the purchase order. Upon documents, upon receipt of documents." *Id*. at 21. Goodman also detailed Pasco's process for receipt and payment of the Stainless Steel. In general, after calculating the weight of a shipment of steel, payments were made "the same day or next day." *Id.* at 12. As to the first truckload of steel, Goodman testified that after calculating the steel's weight, a wire transfer to Delta-T in the amount of $30,024.00 was made on January 7, 2010, the day after the Stainless Steel arrived at Pasco's facility, "[b]ecause the material was wrapped in dunnage and it had to be removed and weighed and deducted off the inbound weight so we weren't buying wood[,] we were just buying metal." *Id.* at 6-7, 10 (citing Deposition Exh. 2). Goodman also related that payment

---

[15] Hughes testified at a hearing before this Court on October 20, 2010, the transcript of which was submitted in this proceeding as Stipulated Exhibit 26. Hughes' testimony was substantially the same as in the Hughes Deposition regarding the Pasco transaction and will be summarized in Section III.B.3, *infra*.

14

was not immediately made because additional trucks were en route. *Id.* at 14-15.

Pasco sent another payment to Delta-T for three additional truckloads. *Id.* at 16-17. The third truckload of the Stainless Steel finished the weighing process on January 12, 2010, after its receipt on January 11, 2010. *Id.* at 15-16. The remittance advice from Pasco was printed within an hour of weighing and dunnaging the third truck. *Id.* at 17. The remaining truckloads of Stainless Steel were weighed and dunnaged on January 13, 2010. *Id.* at 19. Pasco processed a remittance advice for these materials, totaling $310,936.00, on January 13, 2010. *Id.* at 20.

### 3. The Hearing Testimony of David Hughes

David Hughes testified at the hearing on DCR's Motion for Relief from the Automatic Stay conducted before this Court on October 20, 2010, as recorded in the October 20 Transcript. Hughes testified that he negotiated the sales of the Stainless Steel to Pasco and Central City. October 20 Transcript at 18. Hughes testified that he sent an e-mail to Chuck Langford of DCR on December 4, 2009, advising of the sale of the steel to Central City and believes the agreement with Central City was reached a day or two prior to sending the e-mail. *Id.* at 34-35. Hughes also identified the purchase order from Pasco dated January 5, 2010, and noted that it was his understanding that by that date, an agreement to sell the Stainless Steel to Pasco had been reached. *Id.* at 35.

Hughes described the terms of the sale of the Stainless Steel to Central City. Delta-T was "to be paid in advance at the time the steel was to be removed from site," but that did not occur as "[t]he steel was paid for a day, two days, three days after the steel left the site." *Id.* at 19; *see also id.* at 35-36, 43. The sale terms to Pasco were to be "[u]pon receipt at Pasco Metal & Iron's facility, after they validated the weights then they were to—to pay for the steel" by wire transfer. *Id.* at 19. Hughes confirmed that Pasco did pay by wire transfer and that these payments occurred after Pasco

15

received the steel. *Id.*; *see also id.* at 43. Hughes identified the purchase orders from Pasco and

Central City for the steel, which provided for Pasco to pay "net cash, 100[%] by wire upon receipt"

and for Central City to pay "cash in advance." *Id.* at 20. The loading of the Stainless Steel, which

was stored on pallets, was by forklift or crane upon tractor-trailer trucks at DCR's storage yard,

which, for each buyer, took several days. *Id.* at 18, 21.

Hughes testified Delta-T received two wire transfers of funds from Central City on

December 17, 2009, in the respective amounts of $100,000.00 and $26,000.00. *Id.* at 21. The

Stainless Steel purchased by Central City was loaded on December 15 and 16, 2009, and paid for

on December 17, 2009. *Id*. at 22. Central City also sent two wire transfers for the Stainless Steel

purchased out of the DCR yard on January 14 and 15, 2010, which payments were for steel retrieved

on those respective dates. *Id.* at 23-24. An additional amount of Stainless Steel sold to Central City

was picked up on January 21, 2010. *Id.* at 24. Hughes did not recall the exact date Delta-T was paid

for the latter quantity; he could only recall that Delta-T was paid "within a few days of shipment."

*Id.* at 25.

Pasco retrieved one load of steel from the DCR yard on January 7, 2010, and a payment for

$30,024.00 was received the same day. *Id*. at 26-27. Pasco made a second pickup, consisting of

three truckloads of steel, on January 11, 2010, and a wire transfer of $101,768.00 for payment

thereof was received on January 12, 2010. Two of the three trucks arrived at Pasco and were

weighed on January 11; the third also arrived on January 11 but was not processed until the next

day. *Id.* at 28-29. More trucks with Stainless Steel arrived at Pasco on January 12, 2010, which

were paid for by a wire transfer of $310,396.00 to Delta-T on January 13, 2010. *Id*. at 26, 30.

Delta-T's expectation was "[t]o be paid when the equipment got picked up and weighed in and

delivered," but what actually happened was "[t]hey paid within a few days or a day or two of when the steel was picked up."  *Id.* at 32.

The above-recounted testimony along with the agreed exhibits provides the factual predicate for resolving the remaining question of the Complaint:  determining entitlement to the Garnished Funds between the Trustee and DCR.  The chart below summarizes the time line of the transactions at issue.

| Date | Event |
|---|---|
| Late November/ Early December 2009 | Negotiations begin between Delta-T and Central City; and between Delta-T and Pasco, for the purchase of Stainless Steel located in DCR's yard in Lakeland, Florida |
| December 2, 2009 | Central City issues a purchase order for a portion of the Stainless Steel (which purchase order was later revised) |
| December 4, 2009 | Delta-T accepts Central City's revised purchase order and advises DCR (by e-mail from David Hughes to Chuck Langford) that Central City was authorized to pick up the steel it had purchased |
| December 15, 2009 | Central City picks up a portion of the steel |
| December 16, 2009 | Central City picks up a portion of the steel |
| December 17, 2009 | Central City makes two wire transfers to Delta-T totaling $126,000.00 in payment for the steel picked up on December 15 and 16, 2009 |
| January 5, 2010 | Pasco issues a purchase order for a portion of the Stainless Steel |
| January 5, 2010 | Delta-T accepts the purchase order issued that day by Pasco for the purchase of a portion of the Stainless Steel |
| January 7, 2010 | Pasco picks up a portion of the steel |
| January 7, 2010 | Pasco makes a wire transfer to Delta-T of $30,024.00 in payment of the steel purchases picked up that same day |
| January 11, 2010 | Pasco picks up a portion of the steel |
| January 12, 2010 | Pasco picks up a portion of the steel |

| January 12, 2010 | Pasco makes a wire transfer to Delta-T in payment for the steel picked up on January 11, 2010 |
|---|---|
| January 13, 2010 | Pasco picks up the remaining portion of the steel it purchased |
| January 13, 2010 | Pasco makes a wire transfer to Delta-T in payment for the steel purchases picked up on January 12 and 13, 2010, for total wire transfers made by Pasco between January 7 and January 13, 2010, of $448,728.00 |
| January 14, 2010 | Central City picks up a portion of the steel |
| January 14, 2010 | Central City makes a wire transfer to Delta-T in payment for the steel picked up on that date |
| January 15, 2010 | Central City picks up a portion of the steel |
| January 15, 2010 | Central City makes a wire transfer to Delta-T in payment for the steel picked up on that date (which, combined with the wire transfer made on January 14, 2010, totaled $101,500.00) |
| January 21, 2010 | Central City picks up an additional portion of the steel, which was paid for a few days thereafter |

IV.  Conclusions of Law

A.  The Controlling Legal Issues

As the Trustee has noted, much of what is needed to resolve the dispute between the Trustee and DCR is stipulated here:

> There is no dispute that (i) APTI's liens on accounts were perfected prior to the Judgment Creditor's lien on the BB&T Account (Stipulation, ¶s 4 and 7); (ii) the outstanding amount due under APTI's Promissory Notes exceeds the amount of the Garnished Funds (Stipulation, 6); and (iii) the liens of APTI have been avoided for the benefit of the estate and transferred to the Trustee (November 1, 2011 Settlement Order, Adversary Docket No. 42, Exhibit A, numbered paragraphs 2 and 3).

Pre-Trial Brief of Trustee at 9.  Neither the Court, the Trustee, nor DCR have uncovered any decision precisely factually analogous to the instant dispute.  As a result of this seeming uniqueness, DCR directs the Court to consider prior decisions analyzing the relative priority of a non-purchase

18

money security interest and a purchase money security interest in inventory.  This argument is
founded upon DCR's assertion that at all times, the Stainless Steel remained Delta-T's inventory,
in which the Trustee never held a security interest.  *See* DCR Pre-Trial Brief at 12-15.  The Trustee
argues instead that the decisions offered by DCR supply no assistance in determining the instant
matter as the circumstances here involve not a competition for priority between two creditors with
security interests in the same collateral, but, rather, the assessment of whether the Trustee ever had
an interest in the proceeds of the sale(s) of the Stainless Steel (as represented by the Garnished
Funds).  Pre-Trial Brief of Trustee at 3; *see also id.* at 3 n.3 ("Because the Judgment Creditors [DCR
and M&I] did not have a lien until after the sales were consummated, it is irrelevant whether the
Stainless Steel was or was not 'inventory.'  What matters is whether an 'account' was created in
relation to each sale of the Stainless Steel.").

     This Court believes that the correct resolution to the instant conflict requires a determination
of whether the Trustee, by assignment of APTI's security interest, at any time had an interest in the
Garnished Funds as proceeds of an account or accounts of Delta-T and, if so, did such interest arise
before the garnishment lien of DCR.[16]  DCR contends that at no time under the agreed facts here

---

[16] The relative priority between a holder of a security interest and a lien creditor is
governed by Va. Code Ann. § 8.9A-317, which provides, in pertinent part:

     (a) Conflicting security interests and rights of lien creditors.  A security interest or
     agricultural lien is subordinate to the rights of:

          (1) a person entitled to priority under § 8.9A-322; and

          (2) except as otherwise provided in subsection (e), a person that
          becomes a lien creditor before the earlier of the time:

               (A) the security interest or agricultural lien is
               perfected; or

> (B) one of the conditions specified in subdivision (b)(3) of § 8.9A-203 is met and a financing statement covering the collateral is filed.

Va. Code Ann. § 8.9A-317(a).  Section 8.9A-203 controls when a security interest attaches, thus becoming enforceable, and provides, in pertinent part:

> (a) Attachment. A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.

> (b) Enforceability. Except as otherwise provided in subsections (c) through (i), a security interest is enforceable against the debtor and third parties with respect to the collateral only if:

>> (1) value has been given;

>> (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

>> (3) one of the following conditions is met:

>>> (A) the debtor has authenticated a security agreement that provides a description of the collateral . . . ;

>>> (B) the collateral is not a certificated security and is in the possession of the secured party under § 8.9A-313 pursuant to the debtor's security agreement;

>>> (C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under § 8.8A-301 pursuant to the debtor's security agreement; or

>>> (D) the collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under §§ 8.7-106, 8.9A-104, 8.9A-105, 8.9A-106, or § 8.9A-107 pursuant to the debtor's security agreement.

*Id*. § 8.9A-203(a)-(b).  *See Walker Bank & Trust Co. v. Smith*, 501 P.2d 639, 642 (Nev. 1972)

20

did an account arise and that the Stainless Steel remained Delta-T's inventory at all times until it was

sold, at which time it was immediately converted into proceeds of such inventory and deposited into

Delta-T's bank account at BB&T.   Accordingly, the determination of the respective rights of the

Trustee and DCR in the Garnished Funds attributable to the sales of Stainless Steel to Central City

and Pasco[17] may be distilled to two legal issues: (1) whether an account or accounts arose from the

sale(s) of the steel, and (2) whether the Garnished Funds, or some portion thereof, are properly

characterized as proceeds of such account or accounts, to which the Trustee (by reason of receiving

assignment of APTI's security interests under the Settlement Agreement) has the superior claim.[18]

---

("[I]t is clear that a security interest which is perfected before one becomes a lien creditor enjoys
a preferred position.  The attachment creditor reached only the interest which the debtor had at
the time of attachment.  The debtor's assignment of his interest before attachment gave the
assignee a prior right if the assignment was perfected.") (internal citations omitted).

Under these provisions, the language in the Security Agreements (described in Section
III.A, *supra*) provided APTI (and now the Trustee) with a security interest in the present and
future accounts of Delta-T and the proceeds of all such accounts (*see* Stipulated Exhibits 1
through 18).  Therefore, if an account or accounts came into existence as a result of the sale(s) of
the steel, then the prior security interest of the Trustee would have attached upon creation of the
account(s), which is undisputably before the attachment of DCR's judgment lien on the
Garnished Funds.  As a result, the contest here requires determination as to whether such an
account or accounts did in fact come into existence.

[17] The Trustee and DCR have stipulated that, of the $648,662.59 in funds garnished in the
BB&T account, $47,610.48 is not attributable to the sales of Stainless Steel.  Stipulation ¶¶ 7,
13.  Thus, the amount in controversy totals $601,052.10.  Pre-Trial Brief of Trustee at 2.

[18] A number of other arguments have been raised by DCR and the Trustee (or by APTI in
its pleadings) as to the superiority of their respective claims to the Garnished Funds, which
arguments the parties have now abandoned.  *See supra* Section II.  These arguments include:

1.  A defense raised by DCR that APTI, and subsequently the Trustee by virtue of the Settlement
Agreement, did not have a security interest in the BB&T Account as original collateral.  The
Trustee has chosen not to assert such a claim as a basis for superior entitlement to the Garnished
Funds.  *See* APTI Answer ¶ 165; APTI Crossclaim against DCR ¶ 2; DCR Answer to APTI
Crossclaim ¶ 2; DCR Pre-Trial Brief at 15.

In addition to reviewing the effect of Article 9 of the Uniform Commercial Code upon the instant facts, the Court must also consider the effect of Article 2 of the Uniform Commercial Code governing commercial sales to ascertain if and when an account or accounts arose by reason of the sales of the Stainless Steel to Central City and Pasco by Delta-T.

B.  What is an Account and What is Inventory Under the Uniform Commercial Code?

Consideration of what constitutes an account necessarily begins with the language of the Uniform Commercial Code as enacted in Virginia.[19] Section 8.9A-102(a)(2) of the Code of Virginia

2.  A defense raised by DCR that "[a]ny security interest granted to Bateman Litwin, N.V., would have been avoidable by DCR under the laws of the State of Florida pursuant to Fla. Stat. § 726.106(2)."  DCR Answer ¶ 186.

3.  A defense raised by DCR that "[a]ny security interest granted to Bateman Litwin, N.V., would be unenforceable against DCR under the doctrine of *in pari delicto*."  *Id.* ¶ 187.

4.  A crossclaim raised by APTI against DCR asserting a superior claim to the Garnished Funds, in which APTI contends the Garnished Funds are the proceeds from Delta-T's sale of the raw materials to which Delta-T was given the immediate right of possession by a final judgment rendered in a replevin suit between DCR and Delta-T in the Florida state court.  APTI Crossclaim against DCR ¶¶ 1-16.

5.  A crossclaim raised in the alternative by APTI of superior entitlement to the Garnished Funds, wherein APTI asserted that if the raw materials were the inventory of Delta-T, APTI had a perfected security interest therein without the requirement of a financing statement being filed because the lien on the inventory attached and was liquidated prior to the expiration of the filing deadline under applicable state law.  *Id.* ¶ 21.

[19] The Trustee and DCR agreed on the record at the oral argument that the substantive laws of the Commonwealth of Virginia control, notwithstanding that the location of the Stainless Steel prior to its sale was DCR's facility in Lakeland, Florida.  Va. Code Ann. § 8.9A-301(1) ("Except as otherwise provided in §§ 8.9A-303 through 8.9A-306, the following rules determine the law governing perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral: (1) Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral."); U.C.C. § 9-301 cmt. 3 (1998) ("Scope of Referral.  In designating the jurisdiction whose law governs, this Article directs the court to apply only the substantive ('local') law of a particular jurisdiction and

defines an "account" as:

> "Account," except as used in "account for," means a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) health-care-insurance receivables.  The term does not include (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter-of-credit rights or letters of credit, or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

Va. Code Ann. § 8.9A-102(a)(2).  Thus, an account is a right to payment for property that has been or is to be sold.  While "property" is not a defined term in Title 8.9A of the Virginia Code, § 8.9A-102(a)(44) defines "goods" to include "all things that are movable when a security interest attaches." *Id*. § 8.9A-102(a)(44).  "Accounts" are specifically excluded from the definition of "goods."  *Id*. ("The term ['goods'] . . . does not include accounts . . . .").

Inventory is defined as a type of goods:

> "Inventory" means goods, other than farm products, which:

>> (A) are leased by a person as lessor;

>> (B) are held by a person for sale or lease or to be furnished under a contract of service;

>> (C) are furnished by a person under a contract of service; or

>> (D) consist of raw materials, work in process, or materials used or consumed in a business.

*Id*. § 8.9A-102(a)(48).  David Hughes testified at his deposition that the Stainless Steel was in the

not its choice-of-law rules.").

form of steel tubing that Delta-T intended to use for manufacturing "stainless steel vessels." Hughes

Deposition at 39. Neither the Trustee nor DCR has controverted this testimony. Given Mr. Hughes'

description of the form of the steel, its intended usage, and the lack of any evidence to the contrary,

the Court finds as a finding of fact that the Stainless Steel constituted inventory; consequently, the

Court finds that the Stainless Steel constituted "goods" owned by Delta-T.[20] If the Stainless Steel

remained inventory at all times here and accounts were not created, then DCR must prevail since

the Trustee admittedly does not hold a security interest in Delta-T's inventory. Examination of this

question is determinative of whether DCR or the Trustee has the greater entitlement to the Garnished

Funds.

### C.  When is a Security Interest in an Account Enforceable Under the Uniform Commercial Code?

In order for a security interest to be enforceable, a debtor must have "rights in the collateral."

Virginia Code § 8.9A-203 governs enforceability and provides, in relevant part:

> (a) Attachment. A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment.
>
> (b) Enforceability. Except as otherwise provided in subsections (c) through (i), a security interest is enforceable against the debtor and third parties with respect to the collateral only if:
>
> > (1) value has been given;
> >
> > (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
> >
> > (3) one of the following conditions is met:

---

[20] The Court's determination that the Stainless Steel constituted Delta-T's inventory at one point in time is not intended to simultaneously determine the existence of an Article 9 security interest in the steel by any party.

> (A) the debtor has authenticated a security agreement
> that provides a description of the collateral . . . .

Va. Code Ann. § 8.9A-203(a)-(b)(3)(A).  Judge Ledbetter has succinctly distilled these requirements with respect to accounts:  "A security interest attaches to an account receivable, under a valid security agreement, when the account comes into existence."  *C. W. Jackson Hauling, Inc. v. S. Eagle*, 14 Va. Cir. 401, 1988 WL 619303, at *1 (Va. Cir. Ct. 1988).[21]

---

[21] The United States Court of Appeals for the Fourth Circuit held, with regard to the 1962 version of the Uniform Commercial Code as adopted in Virginia, that the term "accounts receivable" was synonymous with "accounts," or, at the very least, "sufficiently descriptive, as witnessed by the definition in the official comments, its use in other jurisdictions, and the analysis of code commentators, to put third parties on notice that a security interest" was held in the proceeds of a contract by virtue of the term "accounts receivable" being listed as part of the supplied collateral.

> The code does not define "accounts receivable," but in the official comments to the code "accounts" is defined as the "ordinary commercial account receivable."  Va. Code Ann. § 8.9-106, Comment.  The "'Official Comments' of the Code are, of course, not binding on [this] court, . . . but they do represent powerful dicta."  *In re Yale Express System, Inc.*, 370 F.2d 433, 437 (2d Cir. 1966); *see Thompson v. United States*, 408 F.2d 1075 (8th Cir. 1969); *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968).  We need not decide whether the definition in the Official Comments is the proper technical definition, but only whether "accounts receivable" is an adequate description of the [] contract within the context of the code's system of notice filing.  We conclude that the use of the term is reasonably descriptive since anyone going to the code and comments for guidance, be he creditor, debtor, or third party, would be given the definition of "accounts receivable" as advocated by [the creditor].  Even if this is not the exact technical definition of "accounts receivable" as heretofore used by the Virginia courts, a person operating within the code's framework would be on notice that this term could be used to describe a given item of collateral such as the right of payment under the [] contract.

> . . . [I]n two other jurisdictions courts have held that security interest[s] in "accounts" were properly perfected by financing statements which described the collateral as "accounts receivable."  *In re Platt*, 257 F. Supp. 478 (E.D. Pa. 1966); *South County Sand and Gravel Company v. Bituminous Pavers Company*, 256 A.2d 514 (R.I. 1969).  In other cases the terms "accounts" and "accounts receivable" have been used interchangeably.  *E.g.*, *In re Portland Newspaper Publishing Co.*, 3 U.C.C. Rep.

Previously, the Uniform Commercial Code distinguished between "contract rights" and "accounts," with "accounts" resulting from contracts only where performance had occurred. As a result, a security interest in an account could not arise until the contract had been performed. This distinction was conclusively abandoned by revisions in Article 9 of the Uniform Commercial Code:

> Before 1974, various sections of the Commercial Code suggested that an account came into existence *only upon performance.* Former section 9204, subdivision (2)(d) provided that the debtor had no rights "[i]n an account until it comes into existence." The 1974 amendment deleted this provision. It added subdivision (1) to provide, in pertinent part, that "a security agreement may provide that any or all obligations covered by the security agreement are to be secured by afteracquired collateral." (Stats. 1974, ch. 997, § 17, p. 2123, eff. Jan. 1, 1976.) The Uniform Commercial Code Comment to this section says that the statute "makes clear that a security interest arising by virtue of an after-acquired property clause has equal status with a security interest in collateral in which the debtor has rights at the time value is given under the security agreement."

> Similarly, *former* section 9106 defined an "account," as a "contract right," and "general intangibles." The Uniform Commercial Code Comment to this former provision stated that an "'[a]ccount' as defined is a right to payment for goods sold or leased or services rendered: that is to say, a right *earned by performance*, whether or not due and payable . . . ." (Emphasis added; *see Richmond Crane Rigging & Drayage Co. v. Liberty Nat. Bank*, 27 Cal. App. 3d 968, 974, 104 Cal. Rptr. 277 (1972).) The 1974 amendment to section 9106 did away with "contract right" altogether. The amendment, as italicized, provides: "'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, *whether or not it has been earned by performance*." (Stats. 1974, ch. 997, § 11, p. 2121, eff. Jan. 1, 1976.) The Uniform Commercial Code Comment to the amended statute says, "This Article rejects any lingering common law notion that only rights already earned can be assigned."

---

Serv. 194 (Referee's decision; D.C. Or. 1966), *aff'd.*, 271 F. Supp. 395 (D.C. Or. 1967), *aff'd. sub nom.*, *Dubay v. Williams*, 417 F.2d 1277 (9th Cir. 1969); *In re C. E. Pontz & Son, Inc.*, 2 U.C.C. Rep. Serv. 1120 (Referee's decision, E.D. Pa. 1965). While these cases may not fix the proper definition of "accounts receivable," they unquestionably establish that [the creditor]'s use of this term was reasonable, as evidenced by its use in other code jurisdictions.

*Varney Wood Prods., Inc. v. Strickler* (*In re Varney Wood Prods., Inc.*), 458 F.2d 435, 437-38 (4th Cir. 1972).

26

*Bank of Stockton v. Diamond Walnut Growers, Inc.*, 199 Cal. App. 3d 144, 152-53 (1988).  In the context of deciding priority between a security interest in accounts and a federal tax lien, Judge Warriner has also recognized that accounts arise under contracts without regard to performance thereunder:

> The right to payment for services rendered, whether or not earned by performance, is property in existence under the [Federal Tax Lien Act].  An existing right to property (in this case a contractual right to receive money for services to be rendered) is itself property in existence under the Act.  It matters not that fruition of the right is *in futuro* or conditioned upon a corresponding duty on the part of the holder of the right.  The subject of the right, that is, the money to be received for services to be rendered is part and parcel of that right at the time the right is created (in this case when the contracts were entered into) regardless of when the money is actually to be paid or when the right thereto becomes absolute[.]

*Pine Builders, Inc. v. United States*, 413 F. Supp. 77, 82 (E.D. Va. 1976).[22]

It is undisputed that valid security agreements were made by Delta-T granting security interests in accounts, that the Security Agreements were assigned by Bateman Litwin to APTI (and subsequently to the Trustee by virtue of the Settlement Agreement), and that value was given by Bateman Litwin in the form of loan to Delta-T (as documented by the relevant and various promissory notes) to support the security interests at their inception.  *See* Stipulation ¶¶ 4-5.  Accordingly, the analysis turns to whether an account was created from Central City and/or Pasco in favor of Delta-T by reason of the sales of the Stainless Steel.

---

[22] Under the Federal Tax Lien Act as considered by Judge Warriner, the language of the Act requires the identical analysis as that demanded under the Uniform Commercial Code.  *Pine Builders*, 413 F. Supp. at 80 ("The purpose of the Act, we believe, was to fit tax liens into the priority scheme of the UCC."); *see also id.* at 81 ("[The Federal Tax Lien Act] was enacted with the intent of conforming federal tax lien laws to the concepts developed in the Uniform Commercial Code . . . .") (citing H.R. Rep. No. 1884, 2d Sess. 1 (1966)).

### D.  "Cash Sale" Versus "Account"

The overriding themes within DCR's argument are the notions that the Stainless Steel remained the inventory of Delta-T until payment was received by Delta-T from Central City and Pasco; that the transactions were tantamount to "cash sales" of inventory; and, as a result, the payments made by these buyers were proceeds of the Stainless Steel as inventory.  DCR contends, therefore, that no "account" from Central City or Pasco in favor of Delta-T was ever created.  The Trustee in turn argues that, however fleeting the time between acceptance of the Stainless Steel by Central City and Pasco and payment therefor, under the Uniform Commercial Code, "accounts" were created at the time the contracts were entered into by the parties.  Critical to the Trustee's position is the statutory language defining "account" as the "right to payment of a monetary obligation, whether or not earned by performance," which language, as discussed above, removed the necessity of performance to create an account.[23]

---

[23] The materiality of the statutory change obviating the requirement for performance to create an account was recognized by Judge Keir:

What Debtor fails to recognize is that the court in *Finance Co. of America* [*v. U.S. Fidelity and Guaranty Co.*, 353 A.2d 249, 254 (Md. 1976)] was interpreting Maryland's pre-1980 amendments to § 9-106 of the U.C.C.  That version of the U.C.C. recognized "contract rights" and "accounts" as being separate interests.  A "contract right" meant "any right to payment under a contract not yet earned by performance and not evidenced by an instrument or chattel paper", and an "account" was defined as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper."

The current version of § 9-106 of the U.C.C. adopted in Maryland, combines these two interests under the common term "account":

"Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, *whether or not it has been earned by performance.*

28

Courts have divided over whether an account is created when inventory is sold and payment therefor is received proximately to delivery of the sold goods.  In *Bank of Lansing v. Barkley* (*In re Barkley*), 31 B.R. 924 (Bankr. W.D. Mich. 1983), this issue was considered in the context of a motion by the debtor to use cash collateral, where the debtor contended monies received were not subject to a creditor's lien on accounts and proceeds thereof:

> In the present situation, it is unclear whether the debtor was paid immediately for the services he provided, or whether the services were charged on an open account.  The debtor maintains that cash purchases are not proceeds of accounts receivables, and that therefore the monies earned for performing services are not within the ambit of the security agreement.

*Bank of Lansing v. Barkley* (*In re Barkley*), 31 B.R. 924, 926 (Bankr. W.D. Mich. 1983).  In analyzing this issue, Judge Howard reviewed the then-existing case law regarding when an account is created:

> There is a split of authority on whether cash payments are proceeds of account receivables.  A bankruptcy court in *In re Cooper*, 2 B.R. 188 (Bankr. S.D. Tex. 1980) faced the issue in the context of cash sales of concert tickets.  The court stated:
>
>> Thus when goods are sold or leased or services rendered, and such sale, lease or rendition of services is not for cash but on an open account, an account receivable is created.  p. 192.
>
> The court made a distinction between ticket sales made by employees of Cooper, and sales made by independent ticket outlets.  The court held that cash payments made to employees would be the same as cash payments made directly to the debtor.  No account receivables would generate, and therefore those sums were not subject to a security interest.

---

Md. Ann. Code, Com. Law I, § 9-106 (1992) (emphasis added).  Moreover, the Official Comment to § 9-106 expressly provides that "the same rules apply to accounts both before and after performance."

*In re Patio & Porch Sys., Inc*., 194 B.R. 569, 572-73 (Bankr. D. Md. 1996).

Other courts have taken a different approach.  *In Klingner v. Pocono International Raceway, Inc.*, 289 Pa. Super. 484, 433 A.2d 1357, 31 UCC Rep. 1223 (1981), the Pennsylvania Superior Court found that cash sales did produce an account receivable.  The issue before the court was whether a security interest could exist in proceeds of ticket sales.  In reaching its decision that it could, the court states that after a ticket is purchased:

> The raceway simultaneously acquires an account receivable which is immediately converted into proceeds.  The path from inventory to intangible to account receivable to proceeds is a continuous and uninterrupted metamorphosis, through which the security interest remains intact and perfected. § 9-303(2). 433 A.2d 1357, p. 1230

The Rhode Island Supreme Court in *Matthews v. Artic Tire, Inc.*, 7 UCC Rep. 369, 370 (1970) apparently takes the same view since they stated an account exists whether payment is due immediately or in the future.  Other courts have reached the same conclusion.  *See National Bank of Commerce of Birmingham v. Alabama Football, Inc.*, 20 UCC Rep 751 (N.D. Ala. 1976) (Cash given for football tickets was within the ambit of bank's security interest); *Cissell v. First National Bank of Cincinnati*, 476 F. Supp. 474, 27 UCC Rep 1393, 1399 (S.D. Ohio 1979) (Court noted that when contract rights ripened into account receivables, the account immediately vanished because of prepayment, and the resultant funds were cash proceeds).

I believe the rationale in *Klingner v. Pocono Raceway* accurately sets forth the proper approach to the present situation.  Account receivable is broadly defined in the UCC to include any right to payment for goods sold or services rendered.  The UCC makes no distinction between payments received at the time goods are sold or payments not received until thirty days after the transaction.  For courts to rule otherwise and create such a distinction would lead to wholly arbitrary and inconsistent results.  Courts would probably be uniform that payments made thirty days after the transaction are proceeds of an account, however consistency would be shattered when courts have to interpret payments made one day, one hour, or even one minute after the transaction.  The potential variety of decisions would destroy the confidence and security necessary in commercial law.

*Id*. at 926-27.  In concluding, like the *Barkley* court, that an account had been created in the situation

of a cash on delivery sale, one court looked to the definition of "account" under the Uniform

Commercial Code in conjunction with when title to the sold goods transferred.  In *Commonwealth*

*Financial Corp. v. DeWalt*, 555 N.E.2d 1141 (Ill. App. 3d 1990) (hereinafter "*Dewalt*"), a creditor

with a security interest in a debtor's accounts sued the buyer of goods to recover a payment made

directly to the debtor after the creditor had notified the buyer of its lien.  The buyer defended on the

basis that the subject transaction did not create an account.  The court disagreed:

> Section 9-106 of the Code defines an "account" as "any right to payment for goods sold . . . whether or not it has been earned by performance."  (Ill. Rev. Stat. 1987, ch. 26, par. 9-106.)  The Code also provides that goods are sold when title passes from the seller to the buyer for a price.  (Ill. Rev. Stat. 1987, ch. 26, par. 2-106(1).)  Unless otherwise agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods.  Ill. Rev. Stat. 1987, ch. 26, par. 2-401(2).
>
> DeWalt [the buyer] argues on appeal that tender of delivery did not precede payment.  Therefore, he reasons, title did not pass and a sale did not occur until after payment.  He concludes that since a sale did not occur until after payment, no "account" was ever created.
>
> We note that this appears to be a case of first impression in Illinois.  However, having examined the Code, decisions in other jurisdictions, and treatises on this subject, we find DeWalt's reasoning faulty.  In the instant case, title to the goods passed before payment.  Thus, an "account" was created, obligating DeWalt to make his payments to Commonwealth [the creditor].  This is so because in a C.O.D. transaction, title to goods passes immediately upon delivery to the carrier, even though the carrier retains possession on behalf of the seller.  (R. Anderson, Anderson on the Uniform Commercial Code § 2-401:54, at 551 (3rd ed. 1983).)  Furthermore, even though the parties have expressly agreed that the goods will not be delivered until they are paid for, the transfer of title is not deferred until payment.  (R. Anderson, Anderson on the Uniform Commercial Code § 2-401:54, at 551 (3rd ed. 1983).)  It does not matter whether payment is due immediately or in the future, the right to payment is still an "account."  *See Matthews v. Arctic Tire, Inc.* (1970), 106 R.I. 691, 262 A.2d 831.

*DeWalt*, 555 N.E.2d at 1142-43.[24]

---

[24] Dean Nimmer has commented on the correctness of the reasoning in *DeWalt*:

In terms of UCC characterization, an account exists whenever there is a right to payment connected to the sale of goods, whether or not that sale contract has yet been earned by the vendor.  Thus, an existing contract that requires "collect on delivery" (COD) terms creates an account for purposes of Article 9 financing.  In reaching this correct result, the court in *Commonwealth Financial Corp. v. DeWalt*

One court distinguished the proceeds of the sale of raw materials from the payment of past due monies in determining whether an account exists.  In that case, a materials supplier had refused to supply additional materials to a product manufacturer because the manufacturer owed the supplier in excess of $22,000.00.  When the product manufacturer received a new purchase order, the manufacturer, the supplier, and the purchaser arranged for the purchaser to make a direct payment to the supplier equaling the amount owed by the manufacturer to the supplier plus the amount necessary to pay for the materials the manufacturer needed to fulfill the purchase order.  *Martin v. Amercable Corp.*, 990 F.2d 439, 440 (8th Cir. 1993).  Following the purchaser's payment to the supplier, a creditor, which had previously received a favorable judgment against the manufacturer, filed suit against the supplier seeking recovery of the sums paid to it by the purchaser on behalf of the manufacturer.  The United States District Court for the Western District of Arkansas held that the creditor was not entitled to any portion of the purchaser's payment, and the creditor appealed.  *Id.*

> Martin [the creditor] first argues that the district court erred in holding that [the materials supplier] was entitled to the [purchaser's] payment because Martin had a perfected security interest in the money owed by [the purchaser] to [the product manufacturer].  Martin argues that the account was created on September 6, 1988, when the [purchaser's] purchase order was first issued.  For support, Martin points to the U.C.C. which defines an "account" as "any right to payment for goods sold or leased or for services rendered . . . whether or not it has been earned by performance."  Ark. Code Ann. § 4-9-106 (Michie 1991).  Martin further argues that he is at least entitled to $22,108.42, the past-due amounts [the manufacturer] owed to [the materials supplier], and says that the district court clearly erred in holding that this portion of the [purchaser's] payment was a sale of raw materials.  Finally, Martin complains that if we affirm the district court's decision regarding the $41,608

---

emphasized that the passage of title in the particular transaction occurred on delivery to the carrier for shipment.

3 Raymond T. Nimmer *et al.*, Com. Asset-Based Fin. § 19:10 (September 2011).

> [purchaser] payment, parties will be allowed to circumvent, and thus thwart, the
> protections contemplated by the U.C.C.
>
> . . . .
>
> . . . We are persuaded that Martin is entitled to recover that portion of the
> [purchaser's] check ($22,108.42) representing past due amounts that [the
> manufacturer] already owed to [the materials supplier].  This portion of the
> [purchaser's] payment did not represent payment for raw materials; rather, it
> represented payment on a debt owed by [the manufacturer]. [The manufacturer]'s
> direction to [the purchaser] to pay this debt demonstrates [the manufacturer]'s "right
> to payment."  In contrast, [the manufacturer] had no right to the balance of the
> [purchaser's] payment, as that amount represented [the purchaser]'s purchase of raw
> materials directly from [the materials supplier].

*Id.* at 441.  In concluding that bifurcation of the purchaser's payment to the materials supplier was

appropriate, the Eighth Circuit Court of Appeals relied upon a decision of the Fourth Circuit Court

of Appeals in *Mid-Atlantic Supply, Inc. of Virginia v. Three Rivers Aluminum Co.* (*In re Mid-

Atlantic Supply Co.*), 790 F.2d 1121 (4th Cir. 1986), and summarized *Mid-Atlantic* as follows:

> In *Mid-Atlantic*, R.A. Lawson was a corporation hired to construct a
> condominium project, and Mid-Atlantic was a subcontractor hired to obtain and
> install customized windows.  790 F.2d at 1123.  The window supplier initially
> refused to supply the windows to Mid-Atlantic except on a cash basis, but then
> agreed to supply the windows under a joint check arrangement with Lawson and
> Mid-Atlantic.  *Id.*  Lawson issued a check payable jointly to the supplier and Mid-
> Atlantic.  *Id.*  Mid-Atlantic filed for Chapter 11 bankruptcy before the check was
> endorsed.  *Id.* at 1123-24.  The supplier sued the bankruptcy trustee to obtain the
> check.  *Id.* at 1122.  A bank claimed a prior perfected lien in Mid-Atlantic's accounts
> receivable.  *Id.*  The Fourth Circuit held in the supplier's favor, reasoning that
> the U.C.C. was not implicated.  *Id.* at 1128.  The court held that Mid-Atlantic had no
> interest in the check because the transaction was a sale made by the supplier to
> Lawson, as evidenced by the supplier's extension of credit to Lawson and Lawson's
> actual payment to the supplier.  *Id.*

*Martin*, 990 F.2d at 441.  This Court's review of *Mid-Atlantic* suggests the decision of the Fourth

Circuit Court of Appeals therein has little relevance to the instant matter.  The result in *Mid-Atlantic*

was founded upon a conclusion that the disclaimer of any interest in the check subject to the dispute

removed the transaction from the ambit of the Uniform Commercial Code:

> We shall not review in detail again the facts warranting the finding that the check in question was in fact the property of TRACO [the supplier] and that Mid-Atlantic's possession was "in trust." Those same facts are pertinent in resolving whether the Commercial Code is applicable in this case. In effect, TRACO was only induced to manufacture and furnish the windows required for the Freemason project after Lawson was brought into the picture. TRACO had investigated the credit responsibility of Lawson and found the latter credit worthy. It was solely on the basis of Lawson's agreement that the latter would issue a check in payment for the windows payable jointly to TRACO and Mid-Atlantic that TRACO undertook the manufacture and made delivery of the windows. This arrangement, in the opinion of TRACO, ensured that it would receive payment—payment from Lawson—for the windows. Just as in *Ty-Wood*, there were some loose expressions about "ensuring payment," etc. in the discussions but none of these expressions alters the real substance of the transactions. This was in fact and substance a sale made by TRACO on the credit of Lawson to be paid for by Lawson, and actually paid for by this check of Lawson. Mid-Atlantic never had any interest in the sale except that it was necessary that the windows be furnished the project so that it could earn its fee under its subcontract to install them. It recognized this and its president disclaimed any interest in the check, which, as he described it, wasn't "his." There was accordingly no security interest in this case and the Uniform Commercial Code was not implicated in the transaction.

*Mid-Atlantic Supply, Inc. of Virginia v. Three Rivers Aluminum Co.* (*In re Mid-Atlantic Supply Co.*), 790 F.2d 1121, 1128 (4th Cir. 1986). Accordingly, the supporting source of the Eighth Circuit Court of Appeal's conclusion appears inapplicable to the instant facts.

DCR argues that whatever rights existed under the sale contracts for the Stainless Steel in favor of Delta-T were insufficient to constitute an "account" at any time relevant hereto. However, an agreement to sell goods to another creates a right to payment for the seller. *Midlantic Commercial Co. v. Prime Sportswear Corp.*, No. 95 CIV. 10192 SWK, 1999 WL 672914, at *3 (S.D.N.Y. Aug. 26, 1999) (unreported decision). DCR's argument thus fails to recognize that the prior distinction between "contract rights" and an "account" has been discarded from the Uniform Commercial Code, and "contract rights" are now included within the definition of an "account."

34

*NBD Park Ridge Bank v. SRJ Enters., Inc.* (*In re SRJ Enters., Inc.*), 150 B.R. 933, 936-37 (Bankr.

N.D. Ill. 1993) ("[T]he former 1962 [Commercial Code] 'contract right' is now included in the

definition of 'account', except rights to payment other than for goods sold or leased or for services

rendered; those rights are general intangibles.") (citing *Gordon Car and Truck Rental, Inc. v. Am.*

*Motors Leasing Corp.* (*In re Gordon Car and Truck Rental Inc.*), 80 B.R. 12, 15 (N.D.N.Y. 1987);

William D. Hawkland, Richard A. Lord & Charles C. Lewis, Uniform Commercial Code Series §

9-106:02 (1986)); *see also Barber v. State Cent. Bank* (*In re Vanniewaal*), No. 97-81559, 1999 WL

33582224, at *3 (Bankr. C.D. Ill. Aug. 20, 1999) (unreported decision).  Professor Hawkland noted

that the inclusion of "contract rights" in the definition of "account" causes an account to arise at the

time of contraction:

> The 1972 version defines an account to include rights to payment for goods sold or
> leased or services rendered whether or not they have been earned by performance.
> Thus, a secured party claiming accounts as collateral under the 1972 Code would
> have a security interest in the account as soon as the assignor of the contract right or
> account had rights in the collateral, that is, as soon as he or she signed the contract
> giving him or her an ultimate right to payment.  By contrast, the 1962 Code
> specifically provided that the assignor had no rights in the account until it came into
> existence, but that he or she would have rights in the contract right as soon as the
> contract was made.

8 William D. Hawkland, Richard A. Lord & Charles C. Lewis, Uniform Commercial Code Series

§ 9-106:2 (1994); *see also PNC Bank, Delaware v. Berg*, No. 94C-09-208-WTQ, 1997 WL 527978,

at *9 (Del. Super. Jan. 31, 1997) (unreported case) ("In the Court's opinion, both the hourly billing

and the contingency fee contracts meet the definition of 'contract rights,' and therefore 'accounts,'

within the meaning of the Uniform Commercial Code.  The hourly billing contract is an 'existing

contract' creating a 'right to payment,' the hourly fee, that is 'to be earned by future performance,'

future work by an attorney on that case.  In a contingency fee case the 'right to payment' is more

speculative, since the amount of payment to be earned by future performance depends upon whether the case results in a verdict or other recovery in favor of the client.  This seems, however, to be a distinction without a difference."); *N. Supply Co. v. Allco Fin. Servs.*, 728 P.2d 912, 915 (Or. Ct. App. 1986) ("A debtor can have rights in an account for purposes of [Oregon Revised Statute] § 79.2030(1)(c) even though it is not yet earned.") (quoting White and Summers, Uniform Commercial Code 917 (2d ed. 1980)).[25]  It remains to consider these precedents in light of the facts of the instant matter.

### E. Was an Account Created Here, and, If So, When Was It Created?

Analyzing whether accounts were created by the sales of the Stainless Steel by Delta-T must begin with the definition of an "account" under the Uniform Commercial Code:  "a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of . . . ."  Va. Code Ann. § 8.9A-102(a)(2).  The court in *DeWalt* looked to the provisions of the Uniform Commercial Code governing sales to buttress its conclusion that an account was created when title to the goods being sold passed to the purchaser.  A review of the effect of Article 2 of the Uniform Commercial Code also instructs here as to whether an account was created, and, if so, when.

---

[25] The 1962 version of the Uniform Commercial Code, in distinguishing "contract rights" and "accounts," provided that the debtor has no rights in a contract right until the contract has been made and has no rights in an account until it comes into existence.  The prior separation of contract rights from accounts under the Code explains some earlier decisions that held an account did not come into existence until a contract was performed.  *See, e,g.*, *Richmond Crane Rigging & Drayage Co. v. Liberty Nat'l Bank*, 27 Cal. App. 3d 968, 974 (1972); *E. Turgeon Constr. Co. v. Elhatton Plumbing & Heating Corp.*, 292 A.2d 230, 233 (R.I. 1972); *Matthews v. Arctic Tire, Inc.*, 262 A.2d 831, 832-33 (R.I. 1970).  With the collapse of "contract rights" into "accounts" and the current Code's express negation of the necessity of performance to create an account, there appears to be no impediment to concluding an account may be created at the time a contract is formed.

1.  The Effect of Article 2 of the Uniform Commercial Code

The decision in *DeWalt* looked to the provisions of Article 2 of the Uniform Commercial

Code to conclude whether an account had been created there, succinctly finding:

> [i]n the instant case, title to the goods passed before payment.  Thus, an "account"
> was created, obligating DeWalt to make his payments to Commonwealth.  This is so
> because in a C.O.D. transaction, title to goods passes immediately upon delivery to
> the carrier, even though the carrier retains possession on behalf of the seller.
> Furthermore, even though the parties have expressly agreed that the goods will not
> be delivered until they are paid for, the transfer of title is not deferred until payment.
> It does not matter whether payment is due immediately or in the future, the right to
> payment is still an account.

*DeWalt*, 555 N.E.2d at 1142-43 (internal citations omitted).  To determine when title to the Stainless

Steel in the instant matter passed from Delta-T to the respective buyers, the analysis necessarily

begins with § 2-401 of the Uniform Commercial Code as adopted in Virginia, which governs the

passage of title for goods sold:

> Each provision of this title with regard to the rights, obligations and remedies of the
> seller, the buyer, purchasers or other third parties applies irrespective of title to the
> goods except where the provision refers to such title.  Insofar as situations are not
> covered by the other provisions of this title and matters concerning title become
> material the following rules apply:
>
>> (1) Title to goods cannot pass under a contract for sale prior to their
>> identification to the contract (§ 8.2-501), and unless otherwise
>> explicitly agreed the buyer acquires by their identification a special
>> property as limited by this act.  Any retention or reservation by the
>> seller of the title (property) in goods shipped or delivered to the buyer
>> is limited in effect to a reservation of a security interest.  Subject to
>> these provisions and to the provisions of the title on secured
>> transactions (Title 8.9A), title to goods passes from the seller to the
>> buyer in any manner and on any conditions explicitly agreed on by
>> the parties.
>>
>> (2) Unless otherwise explicitly agreed title passes to the buyer at the
>> time and place at which the seller completes his performance with
>> reference to the physical delivery of the goods, despite any
>> reservation of a security interest and even though a document of title

is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading:

> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but

> (b) if the contract requires delivery at destination, title passes on tender there.

(3) Unless other explicitly agreed where delivery is to be made without moving the goods,

> (a) if the seller is to deliver a tangible document of title, title passes at the time when and the place where he delivers such documents and if the seller is to deliver an electronic document of title, title passes when the seller delivers the document; or

> (b) if the goods are at the time of contracting already identified and no documents of title are to be delivered, title passes at the time and place of contracting.

(4) A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance, revests title to the goods in the seller.  Such revesting occurs by operation of law and is not a "sale".

Va. Code Ann. § 8.2-401.  "Identification of goods" is governed by Virginia Code § 8.2-501, which

sets forth the effect identifying the goods being sold has upon a transaction, and provides, in relevant

part:

> (1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties.  In the absence of explicit agreement identification occurs

> > (a) when the contract is made if it is for the sale of goods already existing and identified . . . .

*Id.* § 8.2-501(1)(a).  Thus, where there is no explicit agreement as to when title to goods passes, if (1) the goods are existing and identified at the time of contracting; (2) delivery of the goods is to be made without the seller moving said goods; and (3) there are no documents of title to be delivered by the seller, then title to the goods passes to the buyer at the time and place of contracting.

The Court has already found that the Stainless Steel constituted goods, specifically, inventory, of Delta-T.  *See supra* Section IV.B.  It is undisputed that identification of the Stainless Steel occurred at the time of the issuance of the purchase orders.  Both the Central City and Pasco purchase orders set forth specific quantities of various sizes of pieces of already-existing Stainless Steel for a determined price.  Stipulated Exhibits 19-20.  The Trustee and DCR stipulated that Delta-T accepted the Central City purchase order no later than December 4, 2009.  Stipulation ¶ 9.  The parties also stipulated that Delta-T accepted the Pasco purchase order no later than January 5, 2010.  *Id.* ¶ 11.  The agreements with both Central City and Pasco provided that the purchasers would pick up the steel at DCR's yard in Lakeland, Florida, where it had been located apparently for some time.  *See id.* ¶¶ 8-9; October 20 Transcript at 18, 21.  Goodman, on behalf of Pasco, testified that Pasco's purchase order constituted the entire agreement between Pasco and Delta-T for its purchase of the specified portion of the Stainless Steel.[26]  Goldman Deposition at 4; *see also* Stipulated Exhibit 20.

As neither the Central City nor the Pasco purchase order contains any provisions regarding the passage of title to the Stainless Steel, the provisions of Virginia Code § 8.2-401 govern when title to the steel passed to the purchasers.  Since delivery of the goods was made to both Central City and Pasco without Delta-T moving the Stainless Steel, subsection 3 of § 8.2-401 applies to the

---

[26] The evidence does not suggest, and none of the parties allege, that any writing other than the purchase order was executed relative to Central City's purchase of the specified Stainless Steel.  *See* Stipulated Exhibit 19.

transactions between Delta-T and the purchasers.  The Stainless Steel was identified at the time of

contracting, and none of the evidence here suggests, nor do the parties allege, that Delta-T was to

deliver any documents of title to either of the purchasers.  Thus, the Court concludes as a matter of

law, pursuant to Virginia Code § 8.2-401(3)(b), that title to the Stainless Steel passed to the

purchasers on the respective dates of contracting—to Central City no later than December 4, 2009,

and to Pasco no later than January 5, 2010.

Virginia law (which is substantially similar to that of Illinois at the time *DeWalt* was

decided) supports the logic employed by the court in *DeWalt*.  The Stainless Steel was sold when

title passed to the purchasers.  Va. Code Ann. § 8.2-106(1) (defining sale as "the passing of title

from the seller to the buyer for a price").  The Court has concluded that title passed to the purchasers

at the time of contracting pursuant to Va. Code Ann. § 8.02-401(3)(b).  The sales created rights to

payment in favor of Delta-T; thus, the Court concludes that accounts were created when title to the

Stainless Steel passed to the purchasers, thereby obligating both Central City and Pasco to pay

Delta-T for the steel on the dates of contracting (December 4, 2009, and January 5, 2010,

respectively).  *Id.* § 8.9A-102(a)(2) (defining account as "a right to payment of a monetary

obligation, whether or not earned by performance, (i) for property that has been or is to be sold,

leased, licensed, assigned, or otherwise disposed of . . . .").

Contrary to the result dictated by the statutes applicable here, DCR argues that "accounts"

were never created because any rights of Central City and Pasco in the Stainless Steel were

conditioned upon payment:

> Here, from the time Delta-T accepted each purchase order, the buyers held
> a "special property" interest in the specific steel tubing identified on their respective
> purchase orders under § 8.2A-401.  Since delivery of the goods would be made at
> DCR's yard without Delta-T having to move the goods, title may even have passed

40

to the buyers at the time of contracting under § 8.2A-401(3)(b). But, Central [City's] and Pasco's rights to take possession of, retain or dispose of the steel tubing as against Delta-T, was conditional upon payment of the purchase price at delivery under § 8A.2-507(2). Until each paid the full price, neither was entitled to possession of the steel tubing, or the right to retain or dispose of the steel tubing against Delta-T. Likewise, Delta-T would have been entitled to retake possession of the steel tubing if either failed to pay on delivery. *Id.*

Alternatively, if Delta-T had failed to deliver the steel tubing to either purchaser, neither purchaser would have been obligated to pay anything. Once delivery occurred, however[,] a final disposition of the steel tubing took place, and as Mr. Hughes testified, the wire transfer payments were exchanged for the steel tubing. Thus, to the extent any of the Garnished Funds are traceable, they are cash proceeds of the inventory collateral.

DCR Trial Memorandum at 11-12.[27] Accordingly, DCR, contends that the identification of the Stainless Steel being sold pursuant to the purchase orders bestowed upon the purchasers a "special property interest" and nothing more, including the right to possession of the goods, until payment was tendered to Delta-T. Further, DCR asserts that, even if title to the Stainless Steel passed at the time of contraction between Delta-T and Central City and Pasco, the rights of the purchasers to possess the Stainless Steel were conditioned on payment for the Stainless Steel at the time of delivery. Therefore, DCR argues, the transactions must be characterized not as creating "accounts" at the time of contracting, but instead as "cash sales" of the inventory that occurred when the payment conditions were satisfied by the purchasers.

It is of no moment that Central City agreed to pay Delta-T "cash in advance," that Pasco agreed to pay Delta-T upon receipt of the steel, or that the payment terms were not fully complied with by either purchaser. Just as the court reasoned in *DeWalt*, the passages of title in the instant

---

[27] The statutory citations contained in DCR's trial memorandum referencing Title 8.2A of the Virginia Code (governing leases) appear to actually relate to Title 8.2, which governs sales, and the Court will interpret the citations accordingly.

matter were not deferred until payment; the "rights to payment" was created by the passages of title, with the accounts resulting in favor of Delta-T. *DeWalt*, 555 N.E.2d at 1143 ("It does not matter whether payment is due immediately or in the future, the right to payment is still an 'account.'") (citing *Matthews v. Arctic Tire, Inc.*, 262 A.2d 831, 833 (R.I. 1970)).

Likewise, Judge Teel has well-described the effect of § 2-401 of the Uniform Commercial Code and the effect of delivery upon the passage of title to goods:

> In making this argument, the debtor fails to appreciate the proper relationship between the UCC identification and title provisions. Identification of goods to the contract establishes when the buyer obtains a special property and an insurable interest in the goods. UCC § 2-501(1). This is important for the buyer's protection when the goods have yet to be delivered for it allows the buyer to obtain insurance, *see* UCC § 2-501, and, in some circumstances, to recover the identified goods, *see* UCC § 2-502 (recovery from insolvent seller); UCC § 2-711(2)(a) (recovery from defaulting or repudiating seller); UCC § 2-716(3) (replevin of goods if cannot cover); *see also* UCC § 2-402 (buyer's rights to recover identified goods trump those of seller's general unsecured creditors). Identification also establishes the earliest point at which title to the goods can pass to the buyer. *First Nat'l Bank of Elkhart County v. Smoker*, 153 Ind. App. 71, 286 N.E.2d 203, 212 (1972), *reh'g denied*, 153 Ind. App. 71, 287 N.E.2d 788; *see* UCC § 2-401(1). However, on delivery of the goods, identification ceases to have significance as a concept (except in the case of a sale on approval, *see* UCC § 2-327(1)(a)). At this time the buyer does not have just a "special property" and "an insurable interest" in the goods but actual title to the goods themselves. "Identification refers to when the goods are still in the possession of the seller." *Smoker*, 286 N.E.2d at 212.

*In re Alcom Am. Corp.*, 156 B.R. 873, 883 (Bankr. D.D.C. 1993).

In the instant matter, as noted by Judge Teel, the "special property interest" of the purchasers of the Stainless Steel was immaterial after delivery of the steel because the purchasers held actual title at that point. As explained above, pursuant to Article 2 of the Uniform Commercial Code as adopted in Virginia, once the purchasers held title to the steel, which here occurred at the time of contracting because the purchasers were obligated to retrieve the steel from DCR's yard in Florida, *see* Va. Code Ann. § 8.2-401(3)(b), the steel was considered "sold," and the goods no longer

42

constituted inventory of Delta-T.  The extent of Delta-T's interest from the time of the sales forward

consisted of the accounts, *i.e.*, the rights to payment from the purchasers.  In other words,

simultaneous with the passages of title to the Stainless Steel to the buyers, the nature of Delta-T's

assets transformed into the accounts resulting from the sales of the steel.  *See Klingner v. Pocono

Int'l Raceway, Inc.*, 433 A.2d 1357, 1362 (Pa. Super. 1981) ("The path from inventory to intangible

to account receivable to proceeds is a continuous and uninterrupted metamorphosis . . . .").

DCR's reliance upon the provisions of § 8.2-507 of the Virginia Code is also misplaced.  By

contending that the statute dictates that any rights of Central City and Pasco in the Stainless Steel

were contingent upon payment and delivery, thus preventing the creation of accounts by these

transactions, DCR misapprehends the terminology utilized in § 8.2-507, which provides:

> (1) Tender of delivery is a condition to the buyer's duty to accept the goods and,
> unless otherwise agreed, to his duty to pay for them.  Tender entitles the seller to
> acceptance of the goods and to payment according to the contract.

> (2) Where payment is due and demanded on the delivery to the buyer of goods or
> documents of title, his right as against the seller to retain or dispose of them is
> conditional upon his making the payment due.

Va. Code Ann. § 8.2-507.  Virginia Code § 8.2-507, along with § 8.2-702,  relates to the rights of

a seller to reclaim goods from a defaulting buyer.  *See In re Helms Veneer Corp.*, 287 F. Supp. 840,

846 (W.D. Va. 1968) ("We interpret § 2-507 and § 2-511 of the Virginia U.C.C. as giving the seller

a right to reclaim his goods from the buyer where a cash transaction has occurred, and a check, taken

in payment by the seller, was dishonored.  However, the right to reclaim is limited to a ten day

period from the delivery of the goods as provided by § 2-507 by virtue of its cross reference to §

2-702.").  While some courts describe § 2-507 of the Uniform Commercial Code as relating to the

reclamation rights of a "cash seller" and § 2-702 as relating to the reclamation rights of a "credit

43

seller," *see Helms*, 287 F. Supp. at 843-45, this Court can locate no decisions that have applied § 2-507 or even the concept of the rights of reclamation by a "cash seller" or a "credit seller" to determine whether an account arose from a sale of goods.

DCR also refers the Court to the holding of *Old Stone Bank v. Tycon I Building Ltd. Partnership*, 946 F.2d 271 (4th Cir. 1991) (hereinafter "*Old Stone*"), as support for its contention that no account was created by reason of the sales of Stainless Steel. In *Old Stone*, the Fourth Circuit Court of Appeals determined that a forfeited deposit under a real estate contract constituted "proceeds" of a lender's mortgage collateral. *Old Stone*, 946 F.2d at 275-76. DCR describes the analogy of the reasoning of *Old Stone* to the instant controversy as follows:

> The Court noted that had the sale closed the seller would have received the deposit to apply to the purchase price. The Court considered the argument that because the sale did not close[,] the collateral remained intact, and still owned by the seller, still subject to the mortgage. The Court explained that even if it adopted this "substitution of collateral" analysis, the earnest money deposit had been substituted for collateral in two ways. First, the purchaser obtained equitable title, and valuable rights in the collateral, including the right to sell the right to buy the collateral to another. The deposit also would compensate the seller for any decrease in value while the contract was pending. Thus, the deposit was also substituted for that decrease in value. *Old Stone*, 946 F.2d at 274-275. Based on the reasoning expressed, it is clear the Court considered the right to buy the mortgaged property collateral while the contract was pending as a transfer of rights in that mortgaged property collateral, not the temporary creation of a different type of collateral.

DCR's Trial Memorandum at 11. These implications in *Old Stone* are unseen by this Court. The text in *Old Stone* relied upon by DCR provides as follows:

> Even were we to adopt Tycon's "substitution of collateral" test, however, the earnest money would still go to Old Stone. This is so because there are at least two ways in which the earnest money was substituted for collateral in this case. First, the deposit was received in substitution for part of the collateral—the equitable title to the property. The Supreme Court of Virginia has held that when a contract for the sale of real estate is executed, equitable title to the property vests in the purchaser. *Carmichael v. Snyder*, 209 Va. 451, 164 S.E. 2d 703 (1968). "In fact, all the incidents of a real ownership belong to it [the purchaser]." *Id.* 164 S.E. 2d at 706.

44

Indeed, Tycon transferred all the rights to the property which it possessed (equitable title) since legal title had earlier been conveyed to the trustee under the deed of trust. *See Abdelhaq v. Pflug*, 82 B.R. 807 (E.D. Va. 1988). Tycon contends, however, that this transfer does not constitute a disposition of the collateral because upon forfeiture, equitable title was reconveyed to Tycon. This ignores the fact that during the pendency of the sales contract the deposit was substituted for valuable rights in the collateral, including the power to sell these rights to another. Thus, the sale of real estate need not be fully consummated to constitute a disposition.

This brings us to the second way in which the deposit substituted for collateral. An important purpose of an earnest money deposit is to compensate for a decrease in the worth of real estate that may occur while it is under a contract of sale. The property, in fact, appeared to decline in value during the pendency of this contract, and the deposit substituted for that decrease. Old Stone, not the debtor, suffered from this decline in value because the value of the collateral was no longer sufficient to cover its lien. Consequently, the concern in this case is not with double recovery as in *Shooting Star*, but with inadequate recovery. In sum, we believe that the earnest money deposit constituted proceeds of the property and that Old Stone had a valid security interest in those proceeds.

*Old Stone*, 946 F.2d at 274-75. This Court is at a loss to comprehend how this reasoning, finding an earnest money deposit to be proceeds, supports the notion that accounts were not created by the sales of the Stainless Steel.

Under the facts of the instant matter, the Court concludes as a matter of law that title to the Stainless Steel passed to the purchasers at the time of contracting—that is, at the time Delta-T accepted the respective purchase orders of Central City and Pasco—since the goods were specifically identified in the purchase orders, were already in existence, and were delivered to the purchasers without further movement of the goods and without any documents of title being delivered. The sales of the Stainless Steel occurred, under Virginia law, when title passed to the purchasers and created accounts for the benefit of Delta-T without regard to performance.

2.  Does Current U.C.C. § 9-324 Control Whether an Account Was Created?

DCR argues that, although the term "cash sale" is not defined by the Uniform Commercial

Code, decisions interpreting § 9-324 of the current version of the Uniform Commercial Code should control this Court's decision as to whether an account was ever created by the sales of the Stainless Steel.  *See* DCR Trial Memorandum at 12 (citing *Sony Corp. of Am. v. Bank One, West Virginia, Huntington NA*, 85 F.3d 131 (4th Cir. 1996)).[28]  Section 9-324 provides for the priority of purchase money security interests over conflicting security interests in the same collateral or that collateral's proceeds.  However, neither party here alleges to possess a purchase money security interest; instead, the instant situations pits a secured creditor against a judgment lien creditor.  Therefore, the Court must examine Section 9-201(a) of the Uniform Commercial Code, which provides "[e]xcept as otherwise provided in the Uniform Commercial Code, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors."  Va. Code Ann. § 8.9A-201(a).  Comment 2 to Section 8.9A-201 further explains the importance of a security agreement when a third party also asserts a lien:

> Effectiveness of Security Agreement.  Subsection (a) provides that a security agreement is generally effective.  With certain exceptions, a security agreement is effective between the debtor and secured party and is likewise effective against third parties.  Note that "security agreement" is used here (and elsewhere in this Article) as it is defined in Section 9-102: "an agreement that creates or provides for a security interest."  It follows that subsection (a) does not provide that every term or provision contained in a record that contains a security agreement or that is so labeled is effective.  Properly read, former Section 9-201 was to the same effect.  Exceptions to the general rule of subsection (a) arise where there is an overriding provision in this Article or any other Article of the UCC.  For example, Section 9-317 subordinates unperfected security interests to lien creditors and certain buyers, and several provisions in Part 3 subordinate some security interests to other security

---

[28] The Fourth Circuit's decision in *Sony Corp. of America v. Bank One, West Virginia, Huntington NA*, 85 F.3d 131 (4th Cir. 1996), interpreted then-current W. Va. Code § 46-9-312(3), which governed the priority of purchase money security interests.  Following the adoption of amendments to the Uniform Commercial Code in 2000, former W. Va. Code § 46-9-312(3) was designated as W. Va. Code § 46-9-324.  Textual references herein will refer to the current version of applicable sections of the Uniform Commercial Code.

interests and interests of purchasers.

U.C.C. § 9-201 cmt. 2 (1998).

DCR's reliance on Section 9-324 appears to be based upon that section's discussion of inventory and, thus, relates back to the theme that the Stainless Steel remained inventory at all times until Delta-T received payment for it from Central City and Pasco.  To be sure, Virginia Code § 8.9A-324 does address inventory but only to provide a special priority for creditors with a purchase money security interest in inventory:

> (a) General rule; purchase-money priority.  Except as otherwise provided in subsection (g), a perfected purchase-money security interest in goods other than inventory or livestock has priority over a conflicting security interest in the same goods, and, except as otherwise provided in § 8.9A-327, a perfected security interest in its identifiable proceeds also has priority, if the purchase-money security interest is perfected when the debtor receives possession of the collateral or within twenty days thereafter.

> (b) Inventory purchase-money priority. Subject to subsection (c) and except as otherwise provided in subsection (g), a perfected purchase-money security interest in inventory has priority over a conflicting security interest in the same inventory, has priority over a conflicting security interest in chattel paper or an instrument constituting proceeds of the inventory and in proceeds of the chattel paper, if so provided in § 8.9A-330, and, except as otherwise provided in § 8.9A-327, also has priority in identifiable cash proceeds of the inventory to the extent the identifiable cash proceeds are received on or before the delivery of the inventory to a buyer, if:

>> (1) the purchase-money security interest is perfected when the debtor receives possession of the inventory;

>> (2) the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;

>> (3) the holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory; and

>> (4) the notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

47

Va. Code Ann. § 8.9A-324(a)-(b).  Principal among the decisions applying this statute to establish

priority among two competing secured creditors is *Sony Corp. of America v. Bank One, West*

*Virginia, Huntington NA*, 85 F.3d 131 (4th Cir. 1996) (hereinafter "*Sony*").  There a dispute arose

between two secured creditors: the bank, to which the debtor had given a security interest in

"virtually all of [its] personal property; and Sony, as holder of a purchase money security interest

in the debtor's inventory.  A contest arose as to whether payment for goods had occurred in

accordance with the statutory requirement of receipt of identifiable cash proceeds "on or before the

delivery of the inventory to a buyer."  Judge Russell set forth the issue plainly:

> The issue in this case is whether the proceeds from the third shipment of
> tapes were delivered "on or before the delivery" of the goods.  The parties have
> stipulated that the shipment was delivered on September 3, 1992, and that Delinda
> Camera's check in payment for the shipment was dated September 4, 1992.  The
> check was either given directly to the truck driver who delivered the shipment or
> mailed to Stereo Factory by overnight mail.  The Bank argues that payment was not
> made "on or before the delivery" because Stereo Factory did not receive payment on
> the day of delivery.

> This issue is critical because it determines which party has priority to the
> proceeds of the third shipment of tapes.  If Stereo Factory received payment "on or
> before the delivery" of the third shipment of tapes, as Sony contends, then Sony has
> a first priority purchase money security interest in those proceeds under § 46-9-
> 312(3).  If Stereo Factory did not receive payment "on or before the delivery" and
> Sony therefore does not have a priority interest under § 46-9-312(3), then the Bank
> has a priority interest in the proceeds under § 46-9-312(5) which provides that the
> first party to file and perfect its secured interest takes priority.

*Sony*, 85 F.3d at 136.[29]  Judge Russell concluded the brief delay in payment was insufficient to alter

the result intended by the Uniform Commercial Code:

> Where the sale of inventory results in an account, the rights of the purchase money

---

[29] Section 46-9-312(3) of the West Virginia Code, as cited by Judge Russell, is
substantially similar to current Virginia Code § 8.9A-324(b).

secured creditor in the proceeds may conflict with the rights of other creditors who have security interests in the accounts.  The drafters of the U.C.C. decided to protect accounts financers over inventory financers, and they limited the priority of purchase money secured creditors to the cash proceeds of inventory collateral.  As comment 8 to § 46-9-312 explains:

> Many parties financing inventory are quite content to protect their first security interest in the inventory itself, realizing that when inventory is sold, someone else will be financing the accounts and the priority for inventory will not run forward to the accounts.  Indeed, the cash supplied by the accounts financer will be used to pay the inventory financing.

W. Va. Code § 46-9-312 cmt. 8.  In using the "on or before the delivery" language of § 46-9-312(3), the framers intended to differentiate between transactions in which the buyer paid in cash and transactions in which the buyer set up a credit arrangement and ended up owing the seller for the cost of the goods.

*Id*. at 136-37.  Under the facts in *Sony*, the Fourth Circuit concluded that the parties contemplated a cash transaction and that no account arose.  The Court reasoned that the "realities of modern business" caused the delay between unloading the goods and the issuance of a check for payment for the goods; such delay did not indicate an extension of credit.  Instead, the Court found that "payment for the third shipment of tapes was reasonably contemporaneous with the delivery of the goods and constituted payment 'on delivery.'" *Id*. at 136-37.

The Eighth Circuit Court of Appeals ruled similarly in *Kunkel v. Sprague National Bank*, 128 F.3d 636 (8th Cir. 1997) (hereinafter, "*Kunkel*"), relying on the Court's holding in *Sony*.  In *Kunkel*, two creditors competed for priority as to the proceeds from the sale of cattle.  *Kunkel*, 128 F.3d at 638-39.  One creditor claimed superpriority status by virtue of its purchase money security interest in the cattle as inventory of the debtor.  *Id*.  The competing creditor claimed its security interest arose pursuant to a security agreement (which pre-dated the inventory purchase money security interest) covering, *inter alia*, inventory and farm products.  *Id*. at 639.  The latter creditor asserted

49

that the alleged superpriority creditor was not entitled to such status because the proceeds from the cattle sales were not received until two to three days after the cattle were delivered to the purchaser. *Id*. The Eighth Circuit Court of Appeals agreed with the Fourth Circuit's reasoning in *Sony* that the drafters of the Uniform Commercial Code carved out special priority status for inventory financiers but only to the extent that the proceeds from the sale of that inventory were in the form of cash proceeds received reasonably contemporaneously with delivery of the goods being sold. *Id*. (quoting *Sony*, 85 F.3d at 136-37; citing Kan. Stat. Ann § 84-9-312(3)).

DCR contends the circumstances of payment here mirror those in *Sony* and *Kunkel*, and, therefore, this Court should conclude the transactions involving the Stainless Steel were "cash sales" and accounts were not created. A review of these and similarly decided cases indicates that a broader interpretation of the express statutory language "on or before delivery" in the context of purchase money inventory financiers is intended to further the policy underlying Section 324 of the Uniform Commercial Code and does not, as DCR suggests, provide a rule for determining whether an account was created. Judge Russell recognized the purpose of then-Section 9-312 (which is similar to current Virginia Code § 8.9A-324(b)) was to "distinguish between cash proceeds and account proceeds" of sales, *Sony*, 85 F.3d at 136, and to protect financiers of accounts over inventory financiers by limiting the priority of inventory purchase money secured creditors to the cash proceeds of inventory collateral.[30] The application of current Section 9-324 in *Sony* logically

---

[30] In explaining the historical basis for the language of "on or before delivery" in present Section 324 of the Uniform Commercial Code, one court has noted:

> The impetus for amending § 9-312(3) to include language granting a purchase money lender a priority in "identifiable cash proceeds received on or before the delivery of the inventory to a buyer" was, evidently, to eliminate the confusion which existed prior to the 1976 amendment over whether the priority enjoyed by a purchase money

prevents an inventory financier from losing priority to a holder of a non-purchase money security interest in the same inventory when a sales transaction consists effectively of contemporaneous delivery of goods and payment.  Section 9-324 of the Uniform Commercial Code accordingly resolves priority between two creditors with security interests in the same inventory and does not control whether an accounts were created by the sales of the Stainless Steel.

The critical distinction between the facts present in *Sony* and the facts in the instant matter cannot be overlooked.  The *Sony* court was tasked with determining the priority between two parties holding security interests pursuant to Article 9:  an inventory financier and an account financier. *Sony*, 85 F.3d at 134.  The specific type of secured creditors involved necessitated the application of what is now Section 324 of Article 9, which deals with conflicting *security interests*.  That statutory section cannot govern the instant dispute because the parties here consist of a secured creditor pursuant to Article 9, which admittedly does not have a security interest in Delta-T's inventory, and a judgment lien creditor.  As explained above, the policy underlying Section 324, as demonstrated by decisions such as *Sony* and *Kunkel*, is specific to the nature of the conflict present between the types of creditors in *Sony* and the relationships arising therefrom.  That policy cannot be applied here where the only factual analogy between *Sony* and the instant matter is that inventory existed at some point in both transactions.

---

security lender with respect to inventory collateral extended to accounts receivable. The 1976 amendment purported to resolve the issue by expressly limiting the priority status of the purchase money lender to "cash proceeds", leaving the issue of priority as to subsequently received "accounts" (Com. Code § 9106) to be determined by reference to the general provisions of § 9-312(5) (*supra*), there being no other provision governing the priority of conflicting interests in accounts receivable.

*In re Sunrise R.V. Inc.*, 107 B.R. 277, 282 n.9 (Bankr. E.D. Cal. 1989).

Professor Reiley recognized the wisdom of holdings such as *Sony* and *Kunkel* in the context of competing Article 9 security interests. "In preserving the super-priority of the PMSI in inventory, these cases clearly reach the right result. The inventory financier, who has authorized a cash sale, should not lose its priority over a quibble about when payment was received." Eldon H. Reiley, 2 Security Interests in Personal Property § 34:6 (September 2011). Professor Reiley also aptly noted the inappropriateness of utilizing the analytical framework for determining priority among competing security interests under Section 9-324 of the Uniform Commercial Code in deciding whether an account intervened before receipt of cash by a debtor:

> Although not addressed in these cases, it is surly [*sic*] relevant that the quoted phrase from the statute was not intended to answer the question of whether an account intervened as proceeds before a cash payment was received. Rather the statute was intended to tell us that if non-cash proceeds are received and subsequently converted to cash proceeds, the super-priority of the PMSI does not reattach to the subsequent cash.

*Id.*[31] Other sections of the Uniform Commercial Code control when and if an account is in fact created.[32] Because of its relevance to a wholly different issue (that of priority of competing Article 9 security interests in inventory), neither *Sony* nor cases like *Kunkel* that rely on its holding supply the analytical template for adjudicating the instant issue of whether an account was created at any time prior to the attachment of the garnishment lien on the Garnished Funds.[33]

---

[31] Interestingly, in his dissenting opinion in *Sony*, Judge Widener suggested the majority failed to adequately consider whether an account had been created there: "Thus, while the majority acknowledges that a different result obtains if an account is created, it fails to acknowledge that an account is created when payment is received after delivery." *Sony*, 85 F.3d at 143 (Widener, J., dissenting).

[32] *See* Section IV.E.1, *supra.*

[33] Other factual considerations also support withholding application of *Sony* and *Kunkel* the instant matter. For example, it is not clear whether the holder of the conflicting security interest in the debtor's inventory in *Sony* also in fact had a security interest in the accounts of the

F.  Proceeds of the Accounts

Proceeds, as defined by the Uniform Commercial Code as adopted in Virginia, include "(A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral; [and] (C) rights arising out of collateral . . . ." Va. Code Ann. § 8.9A-102(64)(A)-(C).  The parties agree that the source of the majority of the Garnished Funds in the BB&T account was the sales of the Stainless Steel. Stipulation ¶¶ 7, 13.  By definition, the funds collected on the accounts created in favor of Delta-T by the sales of the steel to Central City and Pasco constitute proceeds of the accounts because the accounts constituted collateral under the Security Agreements at their creation.  *See* Section IV.G, *infra*.

Despite DCR's arguments to the contrary, *see* DCR Pre-Trial Brief at 9-12, by statutory definition, the Garnished Funds attributable to the sales of the Stainless Steel cannot be proceeds of inventory because proceeds result only upon the disposition of *collateral*.  Va. Code Ann. § 8.9A-

---

debtor there, as the interest of the conflicting security interest holder was described by the court as having a security interest "in virtually all of Stereo Factory's personal property, including its inventory." *Sony*, 85 F.3d at 134.  Furthermore, the decision in *Kunkel* relied in part upon the application of non-Uniform Commercial Code considerations:

> The answer is found in the Packers and Stockyards Act, 1921, 7 U.S.C. §§ 181-229.  The Act provides that for purposes of livestock sales to packers, "a cash sale means a sale in which the seller does not expressly extend credit to the buyer." 7 U.S.C. § 196(c) (1976).  Even if there is a delay in payment, the transaction is a "cash sale" unless there is an express agreement extending credit from the seller to the buyer. *See The First State Bank v. Gotham Provision Co., Inc.* (*In re Gotham Provision Co.*), 669 F.2d 1000, 1004-05 (5th Cir. Unit B), *cert. denied*, 459 U.S. 858, (1982).  There was no written credit agreement here; therefore, the cattle transactions between Hoxie [the creditor claiming superpriority status] and IBP [the buyer] were cash sales and not accounts receivable.

*Kunkel*, 128 F.3d at 646.

102(64)(A)-(C).  "Collateral" is defined as "the property *subject to a security interest* . . . .  The term includes: (A) proceeds to which a security interest attaches; (B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold; and (C) goods that are the subject of a consignment."  *Id*. § 8.9A-102(12) (emphasis added).  The inventory (*i.e.*, the Stainless Steel) did not constitute collateral when Delta-T held title to it because it was not subject to *any* security interest of *any* party.  In fact, DCR never had a lien on Delta-T's inventory and did not have any lien against any property of Delta-T until the writ of garnishment was entered by the United States District Court for the Middle District of Florida on January 15, 2010 (a point which DCR concedes, *see* DCR Trial Memorandum at 7-8; *see also infra* Section IV.G), which gave DCR a lien on the funds residing with in the Bank of America and BB&T bank accounts.  Thus, the accounts resulting from the sale of the steel cannot be classified as "proceeds" therefrom.  Likewise, since the accounts did not constitute "proceeds," the Garnished Funds cannot be classified as "second generation proceeds," the common term used to refer to the "proceeds of proceeds."  As noted in Official Comment 13(c) to the Uniform Commercial Code:  "The definition of 'proceeds' no longer provides that proceeds of proceeds are themselves proceeds.  That idea is expressed in the revised definition of 'collateral' in Section 9-102."  U.C.C. § 9-102 cmt. 13(c) (1998).

G.  The Priority Dispute in the Garnished Funds

In its Trial Memorandum, DCR correctly analyzes when its garnishment lien on the Garnished Funds arose:

> Under Florida law service of the writs of garnishment upon BB&T and BOA respectively, rendered each Bank liable to DCR for all debts due from each Bank to Delta T.  Moreover:
>
> > Service of the writ creates a lien in or upon any such debts or property at the time of service of the writ or at the time such debts or

54

property come into the garnishee's possession or control.

Fla. Stat. § 77.06(1).

As a result, liens arose in favor of DCR upon the funds in the BOA Account and the BB&T Account on January 15, 2010. Thus, DCR's liens on the Accounts existed more than 90 days before the Petition Date in this case, May 25, 2010, and are enforceable against the Trustee. *In re Specialty Property Development, Inc.*, 399 B.R. 857, 859 (Bankr. M.D. Fla. 2008); *In re Engler*, 394 B.R. 598, 602 (Bankr. M.D. Fla. 2008); *In re Giles*, 271 B.R. 903, 905-06 (Bankr. M.D. Fla. 2002); *Senate Staff Analysis and Economic Impact Statement for Bill SB* 2016 (April 3, 1998, rev. April 22, 1998) at 6-7.

DCR Trial Memorandum at 7-8. The Trustee takes no issue with this point of DCR's analysis. Pre-Trial Brief of Trustee at 2 ("The Judgment Creditors' [DCR and M&I] lien arose on January 15, 2010 . . . .").

The parties have stipulated that the security interests held by APTI (which resulted from the promissory notes executed by Delta-T in favor of Bateman Litwin, N.V., and which notes were assigned to APTI on January 13, 2010), were perfected no later than December 4, 2009 (the date of perfection of the Amended and Restated Promissory Note), and perhaps even earlier under the promissory notes and related security agreements executed and perfected prior to that date. *See* Stipulation ¶ 4; *see also* Stipulated Exhibits 1-18. The language in the Security Agreements (*see* Section III.A, *supra*) provided APTI with a security interest in the accounts of Delta-T. *See* Stipulated Exhibits 1 through 18. The Security Agreements also plainly provide a security interest in the proceeds of Delta-T's accounts. *Id.*

As set forth in Section IV.E.1, accounts arose in favor of Delta-T from the sales of the Stainless Steel to Central City and Pasco. The Court concludes that the security interest now held by the Trustee by virtue of the Settlement Agreement attached to the accounts upon their creation because the other elements of enforceability (the giving of value and the existence of an enforceable

security agreement) were already in place when Delta-T acquired rights in those accounts. *See* Va. Code Ann. § 8.9A-203(a)-(b)(3)(A) (setting forth the requirements for enforceability of a security interest); *see also C. W. Jackson Hauling, Inc. v. S. Eagle*, 14 Va. Cir. 401, 1988 WL 619303, at *1 (Va. Cir. Ct. 1988) ("A security interest attaches to an account receivable, under a valid security agreement, when the account comes into existence."). Thus, the security interest now held by the Trustee attached no later than December 4, 2009, as to the account created by reason of the sale of the Stainless Steel to Central City, and no later than January 5, 2010, with regard to the account from the sale of the steel to Pasco. That security interest was perfected, as stipulated by the parties, upon the filing of the financing statement related to the Amended and Restated Note (*see* Stipulation 4.i) on December 4, 2009. As the Court has determined, *see* Section IV.F, *supra*, that the funds collected on the accounts constitute proceeds thereof, the Court concludes that the Trustee also holds an enforceable and perfected security interest on the portion of the Garnished Funds attributable to the sales of the Stainless Steel.

The relative priority between a secured creditor and a lien creditor is governed by Va. Code Ann. § 8.9A-317, which provides, in pertinent part:

(a) Conflicting security interests and rights of lien creditors. A security interest or agricultural lien is subordinate to the rights of:

(1) a person entitled to priority under § 8.9A-322; and

(2) except as otherwise provided in subsection (e), a person that becomes a lien creditor before the earlier of the time:

(A) the security interest or agricultural lien is perfected; or

(B) one of the conditions specified in subdivision (b)(3) of § 8.9A-203 is met and a financing statement covering the collateral is filed.

56

Va. Code Ann. § 8.9A-317(a).  Under this section, as applicable to the instant facts, the Trustee's

security interest could only be subordinate to DCR's garnishment lien if the latter arose before the

Trustee's security interest in the accounts was perfected.  DCR concedes that its lien did not arise

until January 15, 2010, when the writs of garnishment were served upon BB&T and Bank of

America.  DCR Trial Memorandum at 7-8.  Thus, the Court concludes that DCR's garnishment lien

is subordinate to the Trustee's security interest because the Trustee holds a security interest in the

accounts that was perfected and attached prior to the garnishment lien arising at the bank accounts.

*See Walker Bank & Trust Co. v. Smith*, 501 P.2d 639, 642 (Nev. 1972) ("[I]t is clear that a security

interest which is perfected before one becomes a lien creditor enjoys a preferred position.  The

attachment creditor reached only the interest which the debtor had at the time of attachment.  The

debtor's assignment of his interest before attachment gave the assignee a prior right if the

assignment was perfected.") (internal citations omitted).

Accordingly, as it is undisputed that DCR's garnishment lien on arose on January 15, 2010,

the Court concludes as a matter of law that the Trustee's security interest in the proceeds of the

accounts, which attached and was perfected at the time the accounts arose —no later than December

4, 2009, as to the account created by the sale of the Stainless Steel to Central City and January 5,

2010, as to the account created by the sale of the steel to Pasco—is superior to the lien of DCR as

to that portion of the Garnished Funds attributable to the sales of the Stainless Steel.  *See* Va. Code

Ann. § 8.9A-317(a)(2)(A).

The parties have stipulated that "Delta-T received $676,228.00 as a result of the sales of the

Steel to [Central City] and Pasco.  These funds were deposited into [Delta-T]'s general operating

account at BB&T."  Stipulation ¶ 13.  The parties have also stipulated as to the amounts being held

pursuant to the writs of garnishment obtained by DCR: "BB&T answered the writ and admitted it

holds $648,662.59 (the 'Garnished Funds'). [Bank of America] answered the writ and admitted it

holds $4,470.20. BB&T now holds the Garnished Funds pursuant to the Florida District Court writ."

*Id.* ¶ 7. The parties agree that "[o]f the Garnished Funds, $47,610.48 is not attributable to the sales

of the [Stainless] Steel to Pasco and [Central City].").  *Id.* ¶ 13.[34]  As a result of the parties'

agreements, then, it is axiomatic that the majority of the monies ($601,052.10) comprising the

Garnished Funds held by BB&T ($648,662.59) is attributable to the sales of the Stainless Steel to

Central City and Pasco. The Trustee and DCR agree the Trustee has no interest in the Garnished

Funds in the Bank of America Account. *See* Pre-Trial Brief of Trustee at 7 n.4; DCR Pre-Trial Brief

at 2 n.1.

The Court therefore concludes that the Garnished Funds attributable to the sales of the

Stainless Steel to Central City and Pasco in the amount of $601,052.10 represents proceeds of

accounts on which the Trustee holds a security interest superior to the lien held by DCR. The

Trustee does not hold a security interest on the remainder of the Garnished Funds. Therefore, the

Court finds that DCR's judgment lien is superior as to the remaining amount held by BB&T

pursuant to the writ of garnishment, or $47,610.49. The Court also finds, as a result of the parties'

stipulation, that DCR's judgment lien is superior as to the funds held in the Bank of America

---

[34] In her Pre-Trial Brief, the Trustee posits that when proceeds from specific collateral are intermingled with "non-proceeds," courts apply the "lowest intermediate balance" rule to identify those proceeds attributable to the disposition of the secured collateral. Pre-Trial Brief of Trustee at 15. The Trustee goes on to state that "[t]he parties have stipulated to the fact that the Garnished Funds are traceable under the lowest intermediate balance rule." *Id.* (citing Stipulation ¶ 13). However, the cited stipulation does not refer to the "lowest intermediate balance" rule. In any event, because the parties have stipulated to the amount of the Garnished Funds attributable to the Stainless Steel sales, the Court need not apply the "lowest intermediate balance" rule to the Garnished Funds in the BB&T account.

account pursuant to the writ of garnishment in the amount of $4,470.20. The Court further finds that each party is also entitled to any interest that has accrued on the sums to which they are entitled in an amount proportionate to the division of the funds.

## V.  Summary

Under the instant facts and applicable law, as to Count Twelve of the Trustee's Complaint, the Court concludes that accounts arose when Delta-T contracted to sell the Stainless Steel to Central City and Pasco. The security interest on the accounts and proceeds thereof as set forth in the Security Agreements, which interest is now held by the Trustee as a result of the Settlement Agreement, attached to and was perfected in that portion of the Garnished Funds attributable to the sales of the steel prior to the attachment of the garnishment lien of DCR and M&I. Based upon the stipulations of the parties, the amount of the Garnished Funds that is subject to the security interest of the Trustee is $601,052.10; the remainder of the Garnished Funds are not subject to the security interest of the Trustee pursuant to the Security Agreements. DCR's judgment lien is superior as to the remaining amount held by BB&T ($47,610.49). DCR also holds a superior lien as to the funds held in the Bank of America account in the amount of $4,470.20. Each party is entitled to any interest that has accrued on these sums proportionate to the division of the funds as set forth above.

The Court will enter a separate Order consistent with the findings and conclusions contained in this Memorandum Opinion.

The Clerk shall transmit a copy of this Memorandum Opinion to John D. McIntyre, counsel for the Plaintiff, Clara P. Swanson, Chapter 7 Trustee; Justin F. Paget and Robert M. Quinn, counsel for Defendants DCR Construction, Inc., and M&I Marshall & Ilsley Bank; Ross C. Reeves, counsel for Defendants Applied Process Technology International, LLC, Bateman Litwin, N.V., and

Bateman Engineering; Defendant Pace Analytical Services, Inc.; and Debera F. Conlon, Assistant

United States Trustee.

**Entered in the Eastern District of Virginia on this 9th day of July, 2012.**

STEPHEN C. ST. JOHN
United States Bankruptcy Judge